

**SIGNED this 19th day of August, 2014.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**
_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BRADLEY D. WHITTINGTON and | § | No. 13-11036 |
| LONDA L. WHITTINGTON, | § | |
|     Debtors. | § | Chapter 7 |
| | § | |
| | § | |
| | § | |
| ROBERT S. LIGHT, STANLEY LIGHT, | § | |
| GEORGE GARY DUNCAN, | § | |
| ADRIANNA D. DUNCAN, ROBERT | § | |
| CRAIG DUNCAN, DIANA DUNCAN, and | § | |
| THE MEADOWS AT KYLE II, | § | |
|     Plaintiffs, | § | |
| | § | Adv. Proc. No. 13-01121 |
| v. | § | |
| | § | |
| BRADLEY D. WHITTINGTON, | § | |
|     Defendant. | § | |

**MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT**

In this case, the Court must determine whether certain debts must be deemed non-

dischargeable due to the debtor's failure to disclose side profits he made on land deals in which

1

he served as fiduciary for passive investors.

This matter comes before the Court on the parties' extensively briefed cross-motions for summary judgment:

- Plaintiffs' Combined Motion and Brief for Partial Summary Judgment on Defendant's Affirmative Defenses ("Pl. M.S.J. on Affirm. Defs.") [Dkt. No. 45], Defendant's Response to Plaintiffs' Combined Motion and Brief for Partial Summary Judgment on Defendant's Affirmative Defenses ("Def. Resp. to Pl. M.S.J. on Affirm. Defs.") [Dkt. No. 84], and Reply to Defendant's Response to Plaintiffs' Motion for Partial Summary Judgment ("Pl. Reply to Def. Resp. to Pl. M.S.J. on Affirm. Defs.") [Dkt. No. 87];

- Defendant's Motion for Final Summary Judgment and the memorandum in support thereof ("Def. M.S.J.") [Dkt. No. 88], Plaintiffs' Response to Defendant's Motion for Final Summary Judgment ("Pl. Resp. to Def. M.S.J.") [Dkt. No. 99], and Defendant's Reply to Plaintiffs' Response to Defendant's Motion for Final Summary Judgment ("Def. Reply to Pl. Resp. to Def. M.S.J.") [Dkt. No. 102];

- Plaintiffs' Combined Motion and Brief for Summary Judgment on Defendant's Liability and Damages ("Pl. M.S.J. on Liab.") [Dkt. No. 92], Defendant's Response to Plaintiffs' Combined Motion and Brief for Summary Judgment on Defendant's Liability and Damages ("Def. Resp. to Pl. M.S.J. on Liab.") [Dkt. No. 104], and Plaintiffs' Reply–Summary Judgment Motion on Defendant's Liability and Damages ("Pl. Reply to Def. Resp. to Pl. M.S.J. on Liab.") [Dkt. No. 105].

The Court has considered these submissions; the other pleadings in the record; the exhibits

attached to the various briefs, including the affidavits and deposition transcripts;[1] the arguments made at a hearing on this matter on May 14, 2014 (the "Hearing"); and the relevant law. Leaving aside certain damages issues that must be left for determination upon a more developed factual record, the Court will grant summary judgment to Plaintiffs and deny it to Defendant, Bradley D. Whittington.

## I.    JURISDICTION AND CONSTITUTIONAL AUTHORITY

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and this is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(I); *Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473 (5th Cir. 2009).

As far as constitutional authority, non-dischargeability actions were not "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011) (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)).  To the contrary, non-

---

[1] While all materials in the record have been carefully reviewed, the Court has relied in particular upon the following affidavits and depositions (some of which are attached, unfortunately, in piecemeal fashion to numerous different briefs):  Oral Deposition of Bradley D. Whittington, Dec. 9, 2013 ("Whittington Dep."), attached in various parts to Pl. M.S.J. on Liab., Pl. Resp. to Def. M.S.J., and Def. Resp. to Pl. M.S.J. on Liab. (as Ex. E); Oral Deposition of William T. Gunn, Jan. 10, 2014 ("Gunn Dep."), attached in various parts to Pl. M.S.J. on Liab., Pl. Resp. to Def. M.S.J., Def. M.S.J. (as Ex. A), Def. Resp. to Pl. M.S.J. on Liab. (as Ex. A), and Def. Resp. to Pl. M.S.J. on Affirm. Defs. (as Ex. A); Oral Deposition of Harry John Trube, Feb. 20, 2014 ("Trube Dep."), attached in various parts to Pl. M.S.J. on Liab., Def. Resp. to Pl. M.S.J. on Liab. (as Ex. G), and Def. M.S.J. (as Ex. G); Deposition of George Gary Duncan, Jan. 27, 2014 ("Duncan Dep."), attached in various parts to Pl. M.S.J. on Liab., Pl. Resp. to Def. M.S.J., Def. M.S.J. (as Ex. C), Pl. Reply to Def. Resp. to Pl. M.S.J. on Affirm. Defs.; and Def. Resp. to Pl. M.S.J. on Affirm. Defs. (as Ex. C); Oral Deposition of Grant Gist, Jan. 10, 2014 ("Gist Dep."), attached in various parts to Pl. Resp. to Def. M.S.J., Def. M.S.J. (as Ex. B), Def. Resp. to Pl. M.S.J. on Liab. (as Ex. D), Def. Reply to Pl. Resp. to Def. M.S.J. (as Ex. C), and Def. Resp. to Pl. M.S.J. on Affirm. Defs. (as Ex. B); Affidavit of George Gary Duncan in Support of Pl. M.S.J. on Affirm. Defs. ("Duncan Aff."), attached to Pl. M.S.J. on Affirm Defs. and to Pl. Resp. to Def. M.S.J.; Affidavit of William T. Gunn ("Gunn Aff."), attached to Pl. M.S.J. on Affirm Defs. and to Pl. Resp. to Def. M.S.J.

dischargeability actions "flow from a federal statutory scheme." *Stern*, 131 S.Ct. at 2614.  Thus, the Court has constitutional authority to enter a final judgment.

## II.    FACTUAL BACKGROUND

Due to the tangle of entities, individuals, and transactions, this case has a patina of complexity, but its core is quite simple, and the parties are in essential agreement as to all relevant facts.

The case revolves around the purchases of four properties in the Buda/Kyle area south of Austin, Texas.   The deals at issue (the "Challenged Transactions") were made by three partnerships (the "Investor Partnerships"):  The Meadows at Buda, Ltd. ("Meadows at Buda"), The Meadows at Kyle, Ltd. ("Meadows at Kyle I"), and The Meadows at Kyle II, Ltd. ("Meadows at Kyle II").[2]  Meadows at Buda purchased two properties (the "Hale Property" and the "Finley Property"), Meadows at Kyle I purchased one property (the "Whitten Property"), and Meadows at Kyle II purchased one property (the "Perron Property").  *See generally* Pl. M.S.J. on Liab., Exs. 11, 14, 14A, 15 (Finley Property), Exs. 11, 20, 21, 65 (Hale Property), Exs. 30, 31, 33 (Whitten Property), Exs. 44, 47, 48 (Perron Property).

Robert Light, Stanley Light, George Gary Duncan (who goes by Gary), Adrianna Duncan, Robert Duncan, Diana Duncan (the "Individual Plaintiffs," and together with Meadows at Kyle II, "Plaintiffs") invested (on their own and through affiliated entities) as limited partners in the Investor Partnerships.  *See* Pl. Resp. to Def. M.S.J., Exs. 10, 28, 46.  The general partner of

---

[2] The executed, constitutive documents of the Investor Partnership are attached, among other places, to the Pl. Resp. to Def. M.S.J., Ex. 10 (Meadows at Buda, effective June 11, 2004), Ex. 28 (Meadows at Kyle I, effective Dec. 15, 2006), Ex. 46 (Meadows at Kyle II, effective Aug. 8, 2006).

each Investor Partnership was an entity controlled by Defendant, Whittington.[3] On the basis of his status as manager of each general partner, Whittington signed on behalf of each Investor Partnership at the closing of each Challenged Transaction. The closings took place from June 2004 to August 2006.[4]

What Whittington did not disclose to the limited partners—and what he affirmatively denied to Plaintiff Gary Duncan with respect to the Meadows at Kyle II deal—was that a portion of the purchase amounts paid by the Investor Partnerships never made it to the sellers of the properties. Rather, Whittington and some of his associates (acting through affiliated entities and various intermediaries) took a large cut of each purchase price. An entity called Gunn & Whittington Development I, Ltd. ("G&W"), of which Whittington was 50% owner, received a total of $378,126.80 out of the Meadows at Buda deal (the purchase of the Finley & Hale Properties) and $244,603 out of the Meadows at Kyle I deal (the purchase of the Whitten Property). *See* Pl. M.S.J. on Liab., Ex. 14 (Finley), Ex. 65 (Hale), Ex. 30 (Whitten); Def. Resp. to Pl. M.S.J. on Liab., ¶ 5 (Whittington 50% owner of G&W). An entity called Madras, Inc., of which Whittington was owner, took a $106,548.66 cut of the Meadows at Kyle II deal (the purchase of the Perron Property). *See* Pl. M.S.J. on Liab., Exs. 42, 48, 52, 53; Gunn Aff., ¶ 6.

---

[3] Whittington was manager of La Luz II, LLC, which served as general partner of Meadows at Buda; he was manager of Meadows at Kyle Development Co., LLC, which served as general partner of Meadows at Kyle I; and he was manager of Meadows at Kyle II Development Co., LLC, the general partner of Meadows at Kyle II. *See* Pl. Resp. to Def. M.S.J., Ex. 10 (Whittington signing as manager of La Luz II, LLC, as general partner of Meadows at Buda), Ex. 28 (Whittington signing as manager of Meadows at Kyle Development Co., LLC, as general partner of Meadows at Kyle I), Ex. 46 (Whittington signing as manager of Meadows at Kyle Development Co. II, LLC, as general partner of Meadows at Kyle II).

[4] Meadows at Buda closed on the Finley Property on June 11, 2004. *See* Pl. M.S.J. on Liab., Exs. 14, 14A, 15. Meadows at Buda closed on the Hale Property on June 15, 2004. *See* Pl. M.S.J. on Liab., Exs. 20, 21, 65. Meadows at Kyle I closed on the Whitten Property on December 16, 2005. *See* Pl. M.S.J. on Liab., Exs. 30, 31, 33. Meadows at Kyle II closed on the Perron Property on August 8, 2006. *See* Pl. M.S.J. on Liab., Exs. 47, 48.

When secret cuts to individuals and entities that were not owned by Whittington but that benefited his associates are added in, the non-disclosed payments total more than $1,750,000, out of purchases totaling approximately $7 million.  In other words, more than 20% of the purchase prices paid by the Investor Partnerships went not to the sellers but to Whittington and other third parties.  *See* Pl. M.S.J. on Liab., 5-7 (collecting and summarizing the data).

Whittington and his associates had originally entered into purchase agreements with the sellers of the properties.  Ultimately, however, these original agreements were assigned over to the Investor Partnerships.  The Investor Partnerships then purchased the properties at a higher price, consisting of (1) the originally agreed-upon amounts, which were paid to the sellers, plus (2) the undisclosed "cuts," paid to Whittington and his associates.  For example, Whittington's associates originally contracted to purchase the Hale and Finley Properties at the price of $16,500 per acre, about $3.4 million for the 207 acres of combined land.  But the investors, through Meadows at Buda, ultimately paid $21,000 per acre, more than $4.3 million, for the properties.  The difference of about $938,000 was kept by Whittington and his associates.  The uncontested evidence shows that similar practices were followed with respect to the other properties.  *See generally* Pl. M.S.J. on Liab., 3-8 (citing and summarizing exhibits).

Whittington has sought to justify the "cuts" as a sort of finder's fee or development fee (or both), merited because Whittington and his associates put work into identifying desirable properties and initiating development of the open land into residential subdivisions.  *See, e.g.*, Def. Resp. to Pl. M.S.J. on Affirm. Defs., ¶ 7; Def. Resp. to Pl. M.S.J. on Liab., ¶¶ 5, 14, 28, 35.

Plaintiffs have not disputed that Whittington and his associates may have added value to the land.  Nor do Plaintiffs claim that finder's fees, development fees, or intermediary fees must be disclosed in all real estate transactions.  Rather, their complaint is that the extra fees should

have been disclosed to them by Whittington, *because he was their fiduciary when the transactions took place and the cuts were taken*. Plaintiffs argue that Whittington deliberately hid the cuts from them, intending to deceive them. According to Plaintiffs, because the cuts were taken with the knowledge of and for the benefit of their fiduciary but were not disclosed to them, their fiduciary owes them a return of the cuts, and because this course of dealing amounts to fraud against the limited partners and the Investor Partnerships, his debt to them should be held non-dischargeable under the Bankruptcy Code.

As further evidence that Whittington's nondisclosures were neither innocent nor inadvertent, Plaintiffs note that, in essence, two sets of closing accounts were kept of each transaction, only one of which sets revealed that funds were being diverted to Whittington and his associates instead of being paid to the sellers of each property. *See generally* Pl. M.S.J. on Liab., 3-8 (citing the exhibits that show two sets of figures and breakdowns of payments). Whittington has not provided any innocent explanation of this highly incriminating evidence. In his deposition, he stated only that he did not disclose the secret "fees" to the investors because he and his partner William Gunn "didn't think it was . . . any of their business." *See* Whittington Dep., 48, 54, 98-99.

Plaintiffs point to yet more evidence of ill intent. As to the Meadows at Kyle II transaction, Whittington admitted that he affirmatively lied to Plaintiff Gary Duncan about whether he was reaping a side profit. This transpired because Whittington sent Duncan an incompletely redacted version of one of the contracts. The contract revealed that the sellers of the land were actually being paid a price significantly lower than what the investors were putting into the deal. Duncan questioned Whittington about the discrepancy and asked Whittington if any of the excess was profiting him. Whittington denied he was making side profits on the

project. As he admitted to Duncan in a later deposition: "You called me and asked if I was making any money on the [Meadows at Kyle II/Perron Property] project because you saw the price per acre, and I was not truthful and told you no." Whittington Dep., 99; *see also* Duncan Dep., 49-51.

Not until December 2010 did the Individual Plaintiffs find out about the side profits. That is when Gunn, having become disgruntled with his partner Whittington, disclosed the scheme to Plaintiff Gary Duncan.[5] Because (as Plaintiffs have explained) Whittington remained involved with some of Plaintiffs' investments and properties, Duncan and his fellow Individual Plaintiffs waited to disclose their knowledge until near the closing of a transaction involving the Meadows at Kyle I holdings in September 2012. *See* Duncan Aff., ¶¶ 22-30. At that point they refused to pay Whittington a commission of approximately $120,000 that he was owed. *Id.* Whittington ultimately agreed to forgo that payment, entering into a partial settlement pursuant to which, among other things, the parties agreed he would receive a "credit," in the amount of the forgone commission, against Plaintiffs' potential claims against him. *See* Def. Resp. to Pl. M.S.J. on Liab., Ex. I.

Bradley and Londa Whittington filed for relief under Chapter 7 of Title 11 of the United States Code (the "Code" or the "Bankruptcy Code") on May 31, 2013. Their meeting with creditors under section 341 of the Bankruptcy Code was originally set for June 28, 2013 [No. 13-11036, Dkt No. 4]. Under Federal Rule of Bankruptcy Procedure 4007(c), the last date to commence a proceeding to object to the debtors' discharge was sixty days later, on August 27,

---

[5] At that time, Gunn disclosed the scheme as to Meadows at Kyle I and II. *See* Gunn Aff., ¶¶ 8, 12; Duncan Aff., ¶¶ 11-12. Duncan apparently learned of the Meadows at Buda later. Duncan Aff., ¶ 14. In November of 2013, Plaintiffs entered a settlement and indemnification agreement with Gunn, with Gunn agreeing to make a payment of $160,000 to them. *See* Def. Resp. to Pl. M.S.J. on Liab., Ex. H.

2013. Plaintiffs filed this adversary proceeding on August 26, 2013, seeking to bar the Whittingtons' discharge under § 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code. Plaintiffs dismissed Londa Whittington as a defendant as of November 14, 2013 [Dkt. No. 23]. After the parties submitted their various motions for summary judgment, responsive briefs, and evidence, the Court held the Hearing, and the matter was taken under advisement.

## III.   SUMMARY JUDGMENT STANDARD

Plaintiffs seek summary judgment on liability and damages as well as on all of Whittington's asserted defenses. Whittington seeks summary judgment on certain defenses, including standing and statute of limitations.

Under Federal Rule of Civil Procedure 56, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine issue" of "material fact" is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *James v. Texas Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008).

Plaintiffs bear the burden of proof on non-dischargeability under § 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code, as well as on the amount they are owed. *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) ("A creditor must prove its claim of nondischargeability by a preponderance of the evidence."). Plaintiffs also bear the burden on the issue of whether the Court has jurisdiction, which includes Whittington's challenges to their constitutional standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) ("[T]he party invoking federal jurisdiction bears the burden of establishing its

existence."). Cases suggest that Plaintiffs also bear the burden as to Whittington's challenge to prudential standing and the applicability of Federal Rule of Civil Procedure 17. *See Triple Tee Golf, Inc. v. Nike, Inc.*, No. 4:04-CV-302-A, 2007 WL 4260489, at *25 (N.D. Tex. Aug. 10, 2007) (stating that the "plaintiff . . . must show" that standing is warranted) (quoting *Weiburg v. GTE Sw., Inc.*, 71 F. App'x 440, 2003 WL 21417074, at *2 (5th Cir. 2003) (unpublished))).

"If the movant bears the burden of proof on an issue at trial, a successful motion for summary judgment must present evidence that would entitle the movant to judgment at trial." *Vulcan Constr. Materials v. Kibel (In re Kibel)*, Adv. No. 10-5086, 2011 WL 1042575, at *3 (Bankr. W.D. Tex. Mar. 16, 2011) (citing *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003)). Thus, Plaintiffs must present evidence to support a ruling in their favor on the issues on which they bear the burden of proof. But once they do so, Whittington cannot simply remain silent. "Upon an adequate showing, the burden shifts to the nonmoving party to establish a genuine issue of material fact. The nonmoving party has a duty to respond with specific evidence demonstrating a disputed fact issue." *Id.* (internal citations omitted); *see Sossamon v. Lone Star St. of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

Whittington bears the burden of proving his affirmative defenses, including his argument that this action is barred by the statute of limitations. *See, e.g.*, *Elmo v. Oak Farms Dairy*, No. A-3:07-CV2004-D, 2008 WL 2200265, at *1 (N.D. Tex. May 14, 2008) ("Under Texas law, limitations is an affirmative defense on which the movant bears the burden of proof."); *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985) (laches). For Whittington to be entitled to "summary judgment pursuant to an affirmative defense," he has to "establish all of the elements of the defense." *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 F. App'x 306, 308 (5th Cir. 2011) (unpublished) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.

1986)).  For Plaintiffs to win summary judgment as to Whittington's affirmative defenses, they "need only point to the absence of any fact issue in the record, and the evidentiary burden shifts to the non-moving party to show with 'significant probative' evidence that there exists a triable issue of fact."  *Century Savings & Loan Assoc. v. Eastland*, 21 F.3d 1107, 1994 WL 171463, at *2 (5th Cir. 1994) (unpublished) (quoting *Celotex*, 477 U.S. at 322); *see also Parker v. Cooper Tire & Rubber Co.*, 546 F. App'x 522, 526 (5th Cir. 2014) (unpublished).

Plaintiffs have asserted the "discovery rule" as a means of avoiding Whittington's statute of limitations defense, and on this matter, assuming Whittington otherwise makes out his statute of limitations defense, they have the burden of proof.  *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988).

## IV. ANALYSIS AND HOLDINGS

Plaintiffs allege that Whittington breached his fiduciary duties and committed fraud, and that they should be awarded a range of damages along with attorneys' fees as their claim against him.  They also argue that under § 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code, their claim against Whittington should be deemed non-dischargeable.  Whittington denies that he owes any debt to Plaintiffs, denies that the debt (if any) should be held nondischargeable, and asserts numerous affirmative defenses.

As explained below, the Court holds as a matter of law that Plaintiffs have established that Whittington owes a nondischargeable debt under § 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code as a result of his breach of fiduciary duty, false representation, fraud, and defalcation.[6]  In addition, Plaintiffs have shown themselves entitled to summary judgment on

---

[6] Although the analysis that follows demonstrates that the elements of § 523(a)(2)(A) and § 523(a)(4) are satisfied as to each Investor Partnership and each set of limited partners, in fact,

Whittington's affirmative defenses as well. The precise amount of Plaintiffs' nondischargeable claim, however, remains unclear and will have to be determined pursuant to further hearings.

## A. Non-Dischargeability

### 1. §523(a)(2)(A)

"Despite the more general purpose of the bankruptcy code, which is to give debtors a fresh start, § 523(a)(2)(A) captures a competing principle. Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud." *Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314, 319 (5th Cir. 2005). That said, even in the § 523(a)(2)(A) context, "[e]xceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor." *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997)).

Section 523(a)(2)(A) states that a debt will not be discharged "to the extent [it was] obtained by – false pretenses, a false representation, or actual fraud." Plaintiffs claim that Whittington owes them a debt as a result of "false representation[s]" and "actual fraud."

The Fifth Circuit has explained the elements of § 523(a)(2)(A) thus:

> For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance.

*Acosta*, 406 F.3d at 372.[7] The Court will analyze these elements in order.

---

as discussed below, the underlying causes of action here properly belong to the Investor Partnerships. *See Section IV.B.1.*

[7] The elements required to make out fraud under Texas law essentially track the § 523(a)(2)(A) elements:

### a. Misrepresentation

As to the Meadows at Kyle II transaction, which involved the purchase of the Perron Property, Whittington concedes that he made a misrepresentation concerning whether he was making side profits.

As to the other transactions and properties, Whittington notes that he made no misrepresentation, and he argues this element is unmet. Plaintiffs retort that omitting to inform them about the secret profits was a misrepresentation under law, because Whittington had a duty to disclose the side profits on the Challenged Transactions. "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an *overt act* is *not* required." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001). Plaintiffs argue that Whittington's "duty to speak" arose from his status as a fiduciary with respect to the Investor Partnerships.

---

Texas law requires the following elements to make out a fraud claim: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002)). Similarly:

[F]raud by nondisclosure occurs when: (1) a party conceals or fails to disclose a material fact within that party's knowledge, (2) the party had a duty to disclose the fact, (3) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (4) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, (5) the other party justifiably relied on the nondisclosure, and (6) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*Drexel Highlander Ltd. P'ship v. Edelman (In re Edelman)*, No. 13-3078, 2014 WL 1796217, at *34 (Bankr. N.D. Tex. May 6, 2014).

Although formally speaking, Whittington's debt arises under Texas law concerning fraud and breach of fiduciary duty, and then is held nondischargeable under federal bankruptcy law, as a practical matter, insofar as the bankruptcy elements are met, these Texas law tests have been met as well. The Court will focus (as the parties did) on the federal nondischargeability requirements, providing additional comments on the state liability standards as needed.

Plaintiffs are correct that Whittington was a fiduciary with respect to the Investor Partnerships and their limited partners, and as such, he had a duty to disclose material facts about the Challenged Transactions to them. "Managing partners owe their copartners the highest fiduciary duty recognized in the law." *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425 (Tex. App.—Austin 1997, writ denied); *see also LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 783 (5th Cir. 1993) (noting that under Texas law, the fiduciary obligation of managing partners to their limited partners is "one of the highest fiduciary duties recognized by law"); *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.) ("In a limited partnership, the general partner acting in complete control stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust."); *Cardwell v. Gurley*, No. 4-10-CV-706, 2011 WL 6338813, at *8 (E.D. Tex. Dec. 19, 2011) ("The Fifth Circuit . . . has held that persons exercising control of a business owe trust-type obligations to partners and shareholders that do not control the business . . . ."). Whittington's one-step-removed status, as an individual who was manager of the general partner of the limited partnerships, does not insulate him from this duty. In light of the thorough control he exercised over the Investor Partnerships, which the partnership documents and the record make clear, he took on a fiduciary duty to the limited partners. *See Harwood*, 637 F.3d at 620-24 (concluding in § 523(a)(4) context that an individual's control over a corporate general partner of a limited partnership imposed "trust-type" fiduciary duties on that individual); *Bennett*, 989 F.2d at 787-90 (analyzing Texas case law and determining that control is the "critical fact" to consider in "imposing this high level of [fiduciary] responsibility" on an individual); *McBeth v. Carpenter*, 565 F.3d 171, 177-79 (5th Cir. 2009) (finding that an individual serving as manager of managing partner owed duties to the partnership and limited partners of it); *Mullen v. Jones*

*(In re Jones)*, 445 B.R. 677, 708-13 (Bankr. N.D. Tex. 2011) (analyzing the principles of *Bennett*, *McBeth*, and other cases and concluding that "it appears that managing partners still owe fiduciary duties to partnerships and their limited partners, and this concept applies even in a two-tiered structure where an individual is acting as the manager of the managing general partner").  At the Hearing, moreover, Whittington's counsel conceded that Whittington personally owed fiduciary duties to each partnership and the limited partners.

Under Texas law, Whittington's duty to disclose encompassed all material facts concerning the Challenged Transactions.  "[P]artners owe each other a duty to make full disclosure of all material facts within their knowledge relating to partnership affairs." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (citing *Johnson v. Peckham*, 120 S.W.2d 786, 787-88 (Tex. 1938)); *see also Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984) (articulating this principle); *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988) (applying principle in attorney-client context); *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 877 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("A fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty.").

The self-dealing side profits bring into question the fairness of the transactions and Whittington's ability to act as a trustworthy agent for the Investor Partnerships and the limited partners.  They are plainly "material facts" that must be disclosed.  *See, e.g.*, *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 131-32 (Bankr. N.D. Tex. 2005) (holding that failure to disclose that the defendant was "involved on both the seller's and buyer's side" of transactions "constitutes a concealment of a material fact sufficient to support a charge of

fraud");[8] *see also* Gunn Dep., 40-43 (explaining why under the circumstances of their business circumstances at the time of the Challenged Transactions, Gunn and Whittington faced large potential losses if their investors learned of the secret profits and pulled out of the deals). The materiality of the side profits is further confirmed by Gary Duncan's specific question concerning them when he glimpsed the incompletely redacted Meadows at Kyle II contracts— and Whittington's specific denial in response to that question. Duncan asked, and more to the point, Whittington lied, precisely because the fact was material.

Whittington's only argument of any substance on this element is that the fiduciary relationship arose so late—at or after each closing—that his fiduciary duty could not have been breached by any failure to disclose.

It is true that Texas law teaches that a fiduciary duty must exist before it can be breached. "[T]he trust giving rise to the fiduciary relationship must exist prior to the act creating the debt, i.e. the debtor must have been a trustee prior to his or her wrongdoing." *Cardwell*, 2011 WL 6338813, at *8; *Willis v. Donnelly*, 199 S.W. 3d 262, 276-77 (Tex. 2006) (holding that there could be no claim for breach when allegedly wrongful actions occurred before the alleged fiduciary attained the position that triggered the duties); *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (refusing to impose "informal fiduciary duty" in light of a lack of "preexisting relationship" other than in "arms-length transactions").

---

[8] Indeed, the mere fact that a fiduciary stood on both sides of a transaction with disclosing her conflicted position is often held by itself to raise a presumption that the transaction was unfair. *See Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 22 (Tex. App.—Tyler 2000, pet. denied) ("[W]here self-dealing by the fiduciary is alleged, a presumption of unfairness automatically arise[s] . . . ." (internal quotation marks omitted)); *Roquemore v. Ford Motor Co.*, 290 F. Supp. 130, 136 (N.D. Tex. 1967) ("Even in a case where an agent has an agreement from the buyer that he can make his compensation out of a 'spread' . . . the principal is still entitled to a full disclosure of the material facts and to be treated with the utmost fairness and good faith."), *aff'd*, 400 F.2d 255 (5th Cir. 1968).

Whittington is not clear on when he believes his fiduciary duties *did* arise.  He appears to contend that because "[t]he partnership documents in each transaction were signed at closing," as a result his duty "only arose **after** closing [sic] of each transaction."  Def. Resp. to Pl. M.S.J. on Liab., ¶ 31.  Plaintiffs retort that each partnership was formed and each partnership agreement executed before each closing.  Pl. Reply to Def. Resp. to Pl. M.S.J. on Liab., 3.

The situation is more complicated than either party states.  Meadows at Buda was formed on May 25, 2004, and the partnership agreement was signed on June 11, 2004.  *See* Pl. Resp. to Def. M.S.J., Ex. 10 (signed partnership agreement).  June 11 was the day of the Finley Property transaction, and four days before the Hale Property transaction closed.  *See* Pl. M.S.J. on Liab., Exs. 14, 14A, 15 (Finley Property), Exs. 20, 21, 65 (Hale Property).  Meadows at Kyle I was formed on December 6, 2005, and its partnership agreement was signed on December 15, 2008.  *See* Pl. Resp. to Def. M.S.J., Ex. 28 (signed partnership agreement).  December 15 was the day before the Whitten Property closing.  *See* Pl. M.S.J. on Liab., Exs. 30, 31, 33 (Whitten Property closing).  Meadows at Kyle II was formed on August 6, 2006, and its partnership agreement was signed on August 8, 2006.  *See* Pl. Resp. to Def. M.S.J., Ex. 46 (signed partnership agreement).  August 8 was the day of the Perron Property closing.  *See* Pl. M.S.J. on Liab., Exs. 47, 48 (Perron Property closing).

Thus, based on uncontested evidence, Whittington is wrong about at least the Hale and Whitten Properties, both of which closed at least one day *after* the partnership agreements were signed.  As to the other two properties, Finley and Perron, Plaintiffs admit the agreements were not signed until the day of closing.  Plaintiffs state that these partnership agreements were signed before the closings, but the summary judgment evidence is not clear on this point.  For summary judgment purposes, the Court construes the evidence in Whittington's favor, and accepts his

17

contention that the Meadows at Buda and Meadows at Kyle II partnership agreements were signed "at closing" of the Finley and Perron Properties, and not before.

But even if all the partnership agreements were signed "at closing," Whittington cannot free himself of his duties so easily. He signed all of the closing documents on behalf of the Investor Partnerships. It is clear that at each closing, Whittington, his contractual counterparties, and his limited partners believed he had accepted and was acting in his capacity as manager of the general partner of each entity. In signing these documents, he indicated that he accepted this role—including the fiduciary duties incumbent on it. Regardless of when the documents were signed, the partnerships had to be effective before the purchase documents, because without a partnership there could be no purchaser. Once each partnership formed, the duty to disclose arose, and all necessary disclosures had to be made.

In other words, Whittington's own signature attests to his fiduciary relationship with each Investor Partnership. His signature only had power by virtue of his role as officer and fiduciary of each Investor Partnership. Whittington has provided no support for his idea that he could ignore corporate formalities by signing the transaction documents on behalf of each partnership as if that partnership were indeed formed, but then—having tidily and secretly profited on the transactions at the expense of his partners—turn around and challenge the very authority he claimed to have when he signed. This is wholly unlike the cases cited by Whittington in which duties truly arose *after* arm's-length transactions between parties who later entered into a fiduciary relationship. The Court is not springing any retroactive or unexpected duties upon Whittington.

In sum, Whittington's duties arose either before or at the time of signing—not later. It may be the case that, as Whittington argues, the underlying terms of each deal were agreed upon

much earlier, and thus prior to the arising of a fiduciary relationship.  But that is of no moment; it is not when the secret deal was struck that matters, but when Whittington was required to disclose the deal but failed to do so.  At least at the time of signing, if not before, Whittington's fiduciary responsibility had arisen.  At that moment, therefore, he had the duty to disclose all material facts about the transaction to his limited partners, including the crucial fact that he was making large side profits.  His failure to disclose breached his fiduciary duty under Texas law and is a "misrepresentation" sufficient to meet this element.[9]

There is an alternative argument on this element that bears mentioning.  Plaintiffs have pointed to an unusual provision in each partnership agreement, explicitly imposing fiduciary duties on the limited partners for "exercis[ing] good faith or integrity" in their own affairs and in partnership affairs,

> [A]s those affairs may relate to the acquisition, ownership, development, consulting, and/or sale (collectively, "Development") of other real property.  It is expressly acknowledged, agreed and understood that these duties and responsibilities shall apply to any Development of real property that any limited partners has [sic] entered into since August 1, 2003 . . . .

Pl. Resp. to Def. M.S.J., Exs. 10, 28, 46, § 7.9(b) (identical in each agreement).

G&W was a limited partner in each Investor Partnership.  Whittington acted as manager of G&W—or rather, of its general partner, an entity titled Gunn & Whittington Development II, L.L.C.  *See* Pl. M.S.J. on Liab., Exs. 6, 7.[10]  The clause is not completely lucid, but the projects

---

[9] Under Texas law, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).  The "injury" element is discussed in the section on damages, below.

[10] While the case law discussed above does not directly speak to this particular variant of "nested" partnerships, it seems likely that given Whittington's apparent control of the general partner of G&W, this clause in the partnership contracts bound him as well.

on which G&W "entered into" the "acquisition, ownership, development, consulting, and/or sale" after August 1, 2003 would seem to include the properties at issue here, with the possible exception of the Hale Property.  (Some of the initial contracts on the Hale Property were signed in June and July of 2003.  *See* Trube Dep., 25-26; Whittington Dep., 11; Pl. M.S.J. on Liab., Exs. 6, 7, 11, 12, 79.[11])  In any case, insofar as the duty covered the relevant properties, it seems clear that Whittington breached this duty.  Thus, the alternative argument from Plaintiffs is powerful.  But in light of the primary holding on this element, the Court need not rely on this alternative reasoning.

> b.  Debtor Knew Was False

As to the Meadows at Kyle II transaction, which involved the purchase of the Perron Property, Whittington concedes that he knew his misrepresentation was false.  As to the other Challenged Transactions, Whittington does not contest this element, nor does the Court see how it can be contested.  The failure to disclose the material information undeniably left Plaintiffs with the mis-impression that their investment funds were being used to buy properties, not to fund side deals for the benefit of Whittington.

> c.  Made With Intent to Deceive

Whittington asserts that Plaintiffs' "key failure" is their "lack of proof" regarding the intent to deceive.  He states that since he did not have a duty to disclose the side deals—or at a minimum did not "know" he had such duty—he "could not have formulated the requisite intent to deceive."  Def. Resp. to Pl. M.S.J. on Liab., ¶ 31.

---

[11] Even the Hale Property might be included in the scope of the fiduciary duties imposed by the partnership agreements if the subsequent assignments and agreements concerning that property meet the definition of "enter[ing] into" "Development"—which they might well do.  But the Court has not heard substantial argument on that point and declines to hold one way or the other on it now.

"[I]ssues involving a person's intent usually require a trial." *Nijjar v. Schott (In re Schott)*, Adv. No. 11-5030, 2011 WL 3862026, at *19 (Bankr. W.D. Tex. Aug. 30, 2011). "Summary judgment on issues of intent may be appropriate, however, 'where the record of the case leaves no plausible honest explanation for the debtor's action.'" *Id.* (quoting *PNC Bank v. Laskey (In re Laskey)*, 441 B.R. 853, 856 (Bankr. N.D. Ohio 2010)).

"Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where a debtor makes a false representation and knows or should know that the statement will induce another to act." *Jones*, 445 B.R. at 721 (quoting *Hurst*, 337 B.R. at 133). "A Court may infer an intent to deceive 'from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.' In addition, a Court can look at the totality of the circumstances to determine whether a debtor acted with an intent to deceive." *Fine Lumber & Plywood, Inc. v. Higgs (In re Higgs)*, Adv. No. 12-1134, 2013 WL 3791501, at *3 (Bankr. W.D. Tex. July 19, 2013) (internal citations omitted) (quoting *Acosta*, 406 F.3d at 372); *see also Morrison v. Western Builders of Amarillo (In re Morrison)*, 555 F.3d 473, 482 (5th Cir. 2009) (endorsing a "totality of the circumstances" approach to determining intent to deceive); *Westwood Sq. Ltd. P'ship v. Broome (In re Broome)*, Adv. No. 11-5047, 2014 WL 61235, at *9 (Bankr. S.D. Miss. Jan. 8, 2014) ("Absent direct evidence of fraudulent intent, which rarely exists, courts look to surrounding circumstances to determine intent."). "When examining a debtor's intent under section 523(a)(2)(A), the Court is required to consider whether the circumstances in the aggregate present a picture of deceptive conduct on the part of the debtor, which betrays an intent on the part of the debtor to deceive his creditors." *Ward Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 699 (Bankr. N.D. Tex. 2011).

Because Plaintiffs bear the burden of proof on the issue of intent, in order to prevail at summary judgment they are obligated to "present evidence that would entitle [them] . . . to judgment at trial." *Kibel*, 2011 WL 1042575, at \*3. If they can do so, the burden shifts to Whittington to "establish a genuine issue of material fact." *Id.* "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Sossamon*, 560 F.3d at 326 (5th Cir. 2009).

The totality of the circumstances shows a plain intent to deceive Plaintiffs. Most damning, of course, is the outright lie as to the Meadows at Kyle II transaction, which helps paint "a picture of deceptive conduct on the part of the debtor." *Id.* Whittington's failure to disclose the side profits on the other transactions has to be viewed in light of his outright lie as to the Meadows at Kyle II transaction. These were intentional, deceptive omissions, and Whittington was willing to turn to outright lies when needed.

Plaintiffs have presented evidence that would entitle them to judgment at trial, so the burden has shifted to Whittington to establish a genuine issue of material fact. Whittington asserts that he "had no way of knowing he would have had a duty to disclose . . . and therefore, could not have formulated the requisite intent to deceive." Def. Resp. to Pl. M.S.J. on Liab., ¶ 31; *see* Whittington Dep., 44-45 (explaining the deceptive deal documents by stating that "we didn't feel it was necessary to disclose"), 48 (claiming that he and Gunn "didn't think it was . . . any of their [i.e., the limited partners'] business" whether they were making side profits). Even construing the facts in Whittington's favor and accepting Whittington's (rather implausible) claim that he did not understand his duty to treat Plaintiffs honestly, this element is still met as a matter of law, because the uncontroverted facts surrounding the acquisition of the properties and the side profits taken by Whittington establish that Whittington *intended to deceive* Plaintiffs.

Whittington's allegedly mistaken view as to the nature of his fiduciary duties does not mean he lacked the intent to deceive under this element. It might mean that he did not appreciate the precise legal consequences of his deception, but it does not change the fact that he knew he was deceiving and intended to do so.

No reasonable fact-finder could look at the gains that Whittington stood to make on the transactions, the fact that he admits to having lied as to the Meadows at Kyle II transaction, and the production of dual sets of documents as to each transaction, and yet believe that Whittington did not intend to deceive Plaintiffs as to all of the Challenged Transactions. Whittington intended to (and did) pocket significant, secret gains for himself and his associates as a result of the Challenged Transactions. And he intended Plaintiffs to be deceived as to this fact.

Summary judgment is due to Plaintiffs on this element.[12]

    d. Actually and Justifiably Relied Upon

Actual reliance is straightforward. The Investor Partnerships and limited partners actually entered into the Challenged Transactions, and the uncontroverted evidence shows that

---

[12] The Texas law test for fraud by misrepresentation requires an "intent that [the false representation] should be acted upon," and the test for fraud by nondisclosure requires that that the defendant "intends to induce the other party to take some action by concealing or failing to disclose the [hidden] fact." *See supra* note 7. Although these intent elements differ slightly from that analyzed above, they are plainly met by Whittington's conduct. His clear intention in concealing and lying about the secret profits were to make sure the deals went through as planned—which they did. This intention meets the required Texas elements as well as the federal nondischargeability requirements. In addition, there is a presumption of intent under Texas law when there is self-dealing by a fiduciary. "In [*International Bankers Life Insurance Co. v.*] *Holloway*, [368 S.W.2d 567 (Tex. 1963),] the [Texas] Supreme Court suggested that willful and fraudulent acts are presumed when the fiduciary, as in *Holloway*, gains an additional benefit for himself as a result of his breach." *Lesikar v. Rappeport*, 33 S.W.3d 282, 311 (Tex. App.—Texarkana 2000, pet. denied) (internal citation omitted); *Natho v. Shelton*, No. 03-11-00661-CV, 2014 WL 2522051, at *2 (Tex. App.—Austin May 30, 2014, no. pet. h.) ("When a fiduciary intentionally breaches his duty by self-dealing and thereby gaining a benefit for himself, willful and fraudulent acts are presumed."). Thus, under Texas law, Whittington's intent is likely presumed as a matter of law.

they did so in actual ignorance of material information known to their fiduciary and hidden from them by him. *Mercer*, 246 F.3d at 413 (noting that the "standard of *actual reliance* requires *little of the creditor*"); *see generally* Duncan Aff. (explaining that he was not aware of the secret profits at the time of the deals). Whittington has made no argument and offered no evidence to the contrary.

The record also compels a holding that the reliance was justifiable. "Justifiable reliance is a lesser standard than reasonable reliance . . . but it does not leave reason out of the calculus." *Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409, 423 (Bankr. N.D. Tex. 2006); *see generally Field v. Mans*, 516 U.S. 59 (1995). "The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *Hurst*, 337 B.R. at 133-34. When confronted with a partially redacted contract with numbers that did not quite add up—the only arguable "red flag" here—Duncan asked a pointed question of Whittington, concerning whether he was making side profits on the deal. Whittington lied in response. Duncan trusted this representation by his fiduciary, and neither he nor his fellow Plaintiffs were under a further duty to investigate further. There was nothing "readily apparent or obvious" about Whittington's falsehood that should have triggered further inquiry, nor was there any reason Plaintiffs should have detected his failure to disclose the side profits in the other transactions. "[Whittington] cannot lie to his potential investors . . . and then, when the lies are discovered, cry foul because they should have known better than to trust him." *Arnette*, 454 B.R. at 687-88. Justifiable reliance in the Perron Property transaction is met.

Justifiable reliance in the other transactions is equally established. There were no red

flags to alert Plaintiffs to their fiduciary's breach of his duty to disclose material information.[13] The Investor Partnerships and limited partners invested partnership funds in justifiable reliance on their fiduciary's disclosures—which were, in this case, notably incomplete.

Plaintiffs are entitled to a finding in their favor on this element.

e. Proximately Caused Loss

Whittington claims that the Investor Partnerships and limited partners cannot demonstrate a "proximately caused loss" from his fraud and breach of fiduciary duty, because the partnerships paid a fair price for the land, even if part of what they paid went secretly to him and his associates. But even if accurate—and the evidence so far does not permit the Court to form an opinion on the matter—that is not the salient inquiry. Even if Whittington were able to put on sufficient evidence at trial to demonstrate that the Investor Partnerships did not pay more than fair market value for the properties, the Court holds that his deceit both created a debt to Plaintiffs and proximately caused a "loss" for purposes of § 523(a)(2)(A) of the Bankruptcy Code. There is a large body of Texas case law teaching that when fiduciaries profit from their

---

[13] Some courts, noting that it could be difficult to "prove a negative"—that is, to prove reliance on facts that were not disclosed—have focused their inquiry on whether the concealed information was material, that is, whether it *would have* affected decision-making had it been disclosed, a standard plainly met here. *See Titan Grp. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975) (holding, in securities law context, that "[i]n cases involving nondisclosure of material facts . . . materiality rather than reliance . . . becomes the decisive element of causation."); *see also Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1323-24 (9th Cir. 1996) (applying principle of *Titan* and other cases to bankruptcy context, holding that a finding of materiality sufficed for the reliance element, and citing other cases so holding). Courts have explicitly held that "the nondisclosure of a material fact in the face of a duty to disclose . . . establish[es] the requisite reliance" under § 523(a)(2)(A). *Apte*, 96 F.3d at 1323; *see Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 203 (D.N.J. 1996) (so holding); *Bankcard Centr., Inc. v. Gonzales (In re Gonzales)*, Adv. No. 05-90521, 2007 WL 7216267, at *7 (Bankr. C.D. Cal. Mar. 23, 2007) (same). This approach has much to recommend it. But the Court need not rely on such a blanket rule to find that the evidence here establishes as a matter of law that Plaintiffs justifiably relied on Whittington's misrepresentation as to the Perron Property and on his material omissions as to the other properties.

self-dealing, they are not permitted to keep their side profits—even if damage to the party complaining of breach has not been shown. "Self-dealing transactions may be attacked by the beneficiary even though he has suffered no damages . . . ." *Crenshaw*, 611 S.W.2d at 890 (quoting *Harvey v. Casebeer*, 531 S.W.2d 206, 207 (Tex. Civ. App.—Tyler 1975, no writ)). As the Supreme Court of Texas articulated over seventy years ago, "[i]t would be dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); *De Tenorio v. McGowan*, 510 F.2d 92, 107 (5th Cir. 1975) ("A fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary."); *Tennessee-Louisiana Oil Co. v. Cain*, 400 S.W.2d 318, 331 (Tex. 1966) (citing *Kinzbach* as providing an "answer" as to why the victim of a breach of fiduciary duty is not barred from recovery merely "because [the victim] . . . suffered no loss"); *Johnson v. Brewer & Pritchard*, 73 S.W.3d 193, 200-201 (Tex. 2002) (discussing cases where secret compensation paid to agent of principal by seller was ordered disgorged, "even though the principal was willing to pay the full price desired by the seller"), *accord Burrow v. Arce*, 997 S.W.2d 229, 238-40 (Tex. 1999); *Siegrist v. O'Donnell*, 182 S.W.2d 403, 405 (Tex. Civ. App.—San Antonio 1944, writ ref'd); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 872-75 (Tex. 2001); *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 187 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

The *Kinzbach* court continued that "if the fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all

he has received.'" *Kinzbach*, 160 S.W.2d at 514 (quoting *United States v. Carter*, 217 U.S. 286, 305 (1910)); *Anderson v. Griffith*, 501 S.W.2d 695, 702 (Tex. Civ. App.—Fort Worth 1973, writ ref'd n.r.e.) ("It is the law that when an agent breaches his fiduciary obligation to his principal, he forfeits all compensation for his services as agent, and he must also account to his principal for every profit, benefit or advantage that he received out of the transaction."). "When one's funds or other assets are used by a fiduciary to acquire property for himself, the aggrieved party may seek the property itself or its value." *Lesikar*, 33 S.W.3d at 304.

For this reason, Plaintiffs need not demonstrate that they suffered any further loss in order to sustain their cause of action under § 523(a)(2)(A). This element of § 523(a)(2)(A) is designed to insure that the debt that forms the basis of a creditor's claim arises from the relevant acts—that there is a causal link between them. The Supreme Court in *Cohen v. de a la Cruz* upheld an award of treble damages as a non-dischargeable claim under this section, explaining that § 523(a)(2)(A) "encompasses *any liability arising from* money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." 523 U.S. 213, 223 (1998) (emphasis added); *see also Fire Safe Protection Servs. v. Ayesh (In re Ayesh)*, 465 B.R. 443, 449-52 (Bankr. S.D. Tex. 2011) (analyzing the scope of "arising from" in this section); *Smiedt v. Williams (In re Williams)*, Adv. No. 13-4062, 2014 WL 2624911 (Bankr. E.D. Tex. June 12, 2014) (finding debts for mental anguish, emotional distress and exemplary damages nondischargeable under § 523(a)(4)). "The Supreme Court has read this provision as exempting from discharge all debts arising out of the underlying fraud." *Snook v. Popiel (In re Snook)*, 168 F. App'x 577, 578 (5th Cir. 2006) (unpublished).

Thus, while the Fifth Circuit's test states that a creditor must show that it "sustained a

loss as a proximate result of its reliance," *Acosta*, 406 F.3d at 372, that phrasing should not be read as adding an extrastatutory requirement that a plaintiff demonstrate an exact amount of a monetary "loss" in order to prevail in its nondischargeability suit. Rather, "loss" in this context is construed in a broad sense to include all grounds for recovery—"any debt," as the statutory language indicates—arising from fraud. The statute, in essence, renders nondischargeable the claim of a creditor against a debtor deriving from the prohibited acts. The scope of the term "loss" here is analogous to, for instance, the term "damages," which can include, for example, punitive damages and other forms of awards that do not, strictly speaking, conform precisely to the "damage" suffered by a plaintiff. The principle is demonstrated by the Supreme Court's approval of treble damages as nondischargeable in the *Cruz* case. In sum, another way of phrasing this element would be that the creditor's "claim arising from its reliance on the debtor's false representation" is nondischargeable.

There is clearly a causal link here between the debt Whittington owes the Investor Partnerships and limited partners and the conduct from which it "arises," although as discussed in the damages section below, the exact amount of the appropriate damages remains to be determined. This element is met, as are the other elements of § 523(a)(2)(A).

   2.  *§ 523(a)(4)*

Under 11 U.S.C. § 523(a)(4), a debtor cannot receive a discharge "from any debt . . . for fraud or defalcation while acting in a fiduciary capacity." According to the Fifth Circuit, "[t]his bar to discharge reaches 'debts incurred through abuses of fiduciary positions . . . [and] involv[ing] debts arising from the debtor's acquisition or use of property that is not the debtor's.'" *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011) (quoting *Texas Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d 339, 342 (5th Cir. 1998)). "The term

'fiduciary' in this context is construed narrowly, limited to 'technical trusts' and to traditional fiduciary relationships involving 'trust-type' obligations imposed by statute or common law." *Id.* at 619-20 (quoting *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 784-85 (5th Cir. 1993)). "The scope of the concept of fiduciary under [§ 523(a)(4)] is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." *Id.* (quoting *Bennett*, 989 F.2d at 784). The fiduciary relationship between Whittington as the controlling manager of the general partner of each Investor Partnership to the limited partners of each partnership suffices to trigger liability for a fiduciary under § 523(a)(4). Such was the clear holding of the Fifth Circuit in *Harwood*. 637 F.3d at 622 ("We conclude that an officer of a corporate general partner who is entrusted with the management of the limited partnership and who exercises [a sufficiently significant degree of] control over the limited partnership . . . owes a fiduciary duty to the partnership that satisfies Section 523(a)(4).").

The Court now turns to the issue of whether Whittington incurred a debt to Plaintiffs by fraud or defalcation while acting in his fiduciary capacity.

Fraud in a fiduciary capacity, for purposes of § 523(a)(4), requires "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong . . . and not implied fraud." *Bullock*, 133 S.Ct. at 1759 (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878)). In other words, it requires a showing of "wrongful intent." *Id*. at 1760. In addition, "[f]raud typically requires a false statement or omission." *Id*. (internal quotation marks omitted).

Whittington has committed fraud in a fiduciary capacity. As discussed in the preceding sections of this opinion, there is no genuine issue as to whether Whittington had a fiduciary duty that arose at or before he signed the closing documents in the Challenged Transactions on behalf of each Investor Partnership. His fiduciary duties required him to disclose the side profits to the

29

limited partners in each Investor Partnership before signing the documents on their behalf and taking his secret profits. He intended to deceive Plaintiffs, not only in the misrepresentation that he made but in his omissions as to the other transactions. "This discharge exception 'was intended to reach those debts incurred through abuses of fiduciary positions . . . .'" *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998) (quoting *In re Boyle*, 819 F.2d 583, 588 (5th Cir. 1987)). Whittington's abuse of his position as a fiduciary was a necessary predicate for the injuries suffered by the Investor Partnerships and the limited partners. He would have been unable to commit this fraud if he had not been in a fiduciary position; if one of the Individual Plaintiffs had been acting as general manager of each Investor Partnership, the partnership would have become aware of the side profits, and at a minimum, have made an informed decision as to whether to proceed with the purchase.

A finding of defalcation in a fiduciary capacity can also be sustained. "Even without the necessity of a fraud finding . . . self-dealing and wrongful diversion of . . . funds [in the context of a fiduciary relationship] constitutes a defalcation for the purposes of § 523(a)(4)." *Smiedt v. Williams (In re Williams)*, No. 13-40856, 2014 WL 2624911, at *8 (Bankr. E.D. Tex. June 12, 2014). This is true even under the "heightened culpability standard for defalcation" announced by the Supreme Court in *Bullock*, because intentional self-dealing "clearly meets the [*Bullock*] definition [of defalcation]." *Id.* at *8-9.

The Court construes all relevant facts in Whittington's favor (as the Court must at summary judgment), but nonetheless, any reasonable fact-finder would have to find that he met the "culpable state of mind requirement" in light of his "gross recklessness in respect to the improper nature of the relevant fiduciary behavior." *Bullock*, 133 S.Ct. at 1759. He "'consciously disregard[ed]' (or [was] . . . willfully blind to) 'a substantial and unjustifiable risk'

that his conduct [would] . . . turn out to violate a fiduciary duty." *Id.* (quoting ALI, *Model Penal Code* § 2.02(2)(c), p. 226 (1985)). His "culpable state of mind" is irrefutably established by his admitted lie to Duncan when confronted about the Meadows at Kyle II/Perron Property contract, as well as by the preparation of dual sets of closing documents carefully hiding the secret profits.

Thus, in addition to his debts to Plaintiffs being established and held nondischargeable under § 523(a)(2)(A), Whittington's discharge of these debts must be denied under § 532(a)(4) as well.

### B. Defenses

Whittington has urged several affirmative defenses in response to Plaintiffs' claims. He argues that the Individual Plaintiffs lack standing to bring their claims, that the statute of limitations bars all Plaintiffs' claims, and that the equitable doctrines of fraud, unclean hands, and laches should bar recovery.

#### 1. Standing

Under Federal Rule of Bankruptcy Procedure 4007(c), the deadline for objecting to discharge in this case was August 27, 2013. Plaintiffs filed their complaint on August 26, the day before the deadline ran. But as Whittington points out and Plaintiffs do not dispute, Texas law does not permit claims such as this to be brought by individual limited partners. *See, e.g.*, *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App.—Dallas 2005, no pet.) ("[D]amages for loss in value of the partnership interest . . . are subsumed in the partnership's causes of action.");[14] *Wingate v. Hajdik*, 795 S.W.2d 717, 719-20 (Tex. 1990) (holding that unless a shareholder can show "personal" cause of action and "personal" injury, claims for fraud

---

[14] The Individual Plaintiffs have not claimed to be suing derivatively or to have suffered the sort of direct injuries that can occasionally permit suits by partners instead of the partnership. *See id.* at 249-52 (discussing cases and doctrine).

and breach of fiduciary duty belong to the corporation and not the shareholder); *Hall v. Douglas*, 380 S.W.3d 860, 872-74 (Tex. App.—Dallas 2012, no pet.) (holding that *Nauslar* and *Wingate* principles apply even when equitable remedies such as disgorgement are sought); *Broadmoor Villa, LLC v. Am. Crest, Inc.*, No. CIV-A-H-12-819, 2012 WL 4339286, at *2-3 (S.D. Tex. Aug. 31, 2012) (holding that under Texas law, limited partner could not bring breach of fiduciary duty claims without the partnership because the partner's claims would be "indirect and duplicative" of the partnership's claims), *adopted by* No. CIV-A-H-12-819, 2012 WL 4339207 (S.D. Tex. Sept. 20, 2012); *In re Waco Town Square Partners, L.P.*, No. 11-38928, 2013 WL 3866493, at *4 (Bankr. S.D. Tex. July 24, 2013) (applying Texas law principle that "a shareholder does not have an independent cause of action for injury to the corporation, even if the shareholder is harmed by the wrong," to the partnership context), *remanded on other grounds,* No. BR-11-38928, 2014 WL 991824 (S.D. Tex. Mar. 13, 2014).  Accordingly, Plaintiffs concede that as of the date this complaint was filed, the only Plaintiff with standing to sue was Meadows at Kyle II, and Meadows at Kyle II only had standing with respect to the Perron Property transaction.

Pursuant to assignment agreements executed several months later, however, the Individual Plaintiffs acquired the relevant claims from Meadows at Buda and Meadows at Kyle I.  *See* Pl. M.S.J. on Affirm. Defs., Ex. 56 (assignment agreement stating in relevant part that Meadows at Buda assigns "right, title, and interest" in its legal claims against Whittington to the Individual Plaintiffs), Ex. 57 (assignment agreement[15] stating in relevant part that Meadows at Kyle I assigns "right, title, and interest" in its legal claims against Whittington to the Individual

---

[15]  While this assignment agreement is dated Dec. 31, 2012, the actual execution did not take place until the same time as the Meadows at Buda assignment, many months later.  *See* Duncan Dep., 67 (stating that Meadows at Kyle I assignment was "[p]robably" not executed until "about the same time as [Meadows at] Buda," that is, "about November," 2013).  The analysis in this Memorandum Opinion is premised on this later date.

Plaintiffs).  Plaintiffs argue that these assignments cure any problems that might otherwise have barred their causes of action.

Whittington disagrees.  He does not challenge the effectiveness of these assignments in themselves, but he argues that the claims, even if validly assigned, were already dead by the time of the assignments—and they remain dead.  In other words, as counsel for Whittington colorfully put it, a valid assignment can "cure the sick but not raise the dead":  if a claim is merely infirm (due to the identity of the party bringing it), then an assignment can successfully cure the defect; but where a claim is dead (because it has been forfeited prior to the assignment by the party who could have brought it but failed to), then an assignment cannot resurrect it.  Whittington's theory sounds plausible, but he points to no law really supporting it—and as is discussed below, there are numerous cases running in the other direction, including in practically the exact same context as here.

a.  Constitutional Standing

Whittington does not clearly delineate whether his "standing" argument is Article III/constitutional or prudential/statutory in nature.  Insofar as Whittington challenges Plaintiffs' constitutional standing, that challenge is plainly wrong, under clear Fifth Circuit law.  *See, e.g.*, *Ensley v. Cody Res.*, 171 F.3d 315, 319-20 (5th Cir. 1999) (holding that the lack of shareholder standing under Texas law does not implicate constitutional standing).  Constitutional, "injury in fact" standing requires (1) "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent"; (2) "causal connection between the injury and the conduct complained of"; (3) "likel[ihood] . . . that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs bear the burden of proof on constitutional standing, which is jurisdictional.  *Bennett v. Spear*, 520 U.S. 154, 162

33

(1997).

Plaintiffs have plainly demonstrated their status as investors who were concretely and actually injured by Whittington's conduct (though of course the extent of that injury remains to be determined), and that a favorable decision by the Court would redress this harm. This was decided by the Fifth Circuit in *Ensley*. 171 F.3d at 319-20. The requirements of constitutional standing are met.

      b. Prudential Standing

         i. Rule 17

It is prudential standing that was lacking on the day this adversary proceeding was filed. The difference between constitutional and prudential standing defects is crucial. For instance, Fifth Circuit precedent teaches that a prudential standing defect, such as this one, can be waived if not raised promptly. In the *Ensley* case, the court found that a defendant who waited until the plaintiff had put on its case-in-chief to object to the plaintiff's standing had waived its opportunity to raise the objection. 171 F.3d at 320, *accord Cibolo Waste, Inc. v. City of San Angelo*, 718 F.3d 469, 474 n. 4 (5th Cir. 2013) (citing *Ensley* and noting that appellate court has discretion to consider prudential standing arguments not raised until appeal, but is not required to do so). In fact, the *Ensley* court favorably cited another case, *Whelan v. Abell*, 953 F.2d 663, 671-73 (D.C. Cir. 1992), that held that a district court had abused its discretion in allowing a defendant who waited to raise the issue on the first day of trial to prevail. 171 F.3d at 320.

Prudential standing involves "judicially created limits concern[ing] (1) whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, (2) whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and (3) whether the plaintiff is

asserting his or her own legal rights and interests rather than the legal rights and interests of third parties." *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009) (quoting *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (numbering added by *St. Paul* court)).

It is the third element that was lacking here:  As of the filing of their complaint, the Individual Plaintiffs were in effect "asserting . . . the legal rights and interests of third parties," i.e., the Investor Partnerships. *Id.*  "A plaintiff that does not possess a right under the substantive law is not the real party in interest with respect to that right and may not assert it." *In re Enron Corp. Secs., Derivative & ERISA Litig.,* 279 F.R.D. 395, 409 (S.D. Tex. 2011) (citing *United States v. 936.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir. 1969)).  "[W]hile the question of whether a claimant is the real party in interest is a procedural one, 'that question must be answered with reference to *substantive* state law.'" *BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, 901 F. Supp. 2d 884, 907 (S.D. Tex. 2012) (quoting *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 407 F.3d 34, 48 (2d Cir. 2005)).  Here, the parties agree on the underlying substantive question:  Under Texas law, the Individual Plaintiffs did not have standing until the assignments were made.  With that state law premise in place, the Court looks to federal procedural law to determine the effect of the assignments, including whether dismissal is merited or whether relation back to the original filing of the complaint should be permitted.

What to do when parties are "asserting . . . the legal rights and interests of third parties," *St. Paul Fire & Marine*, 579 F.3d at 539, is addressed by Federal Rule of Civil Procedure 17, which requires that "[a]n action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1); *see* FED. R. BANKR. P. 7017 (applying FED. R. CIV. P. 17 to bankruptcy

adversary proceedings (except as provided in FED. R. BANK. P. 2010(b), which is not relevant here)).  "Some courts have described Rule 17's real-party-in-interest requirement as essentially a codification of this nonconstitutional, prudential limitation on standing."  *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008).  In the *Ensley* case, which dealt with an analogous situation involving a shareholder seeking to assert rights purportedly held by the corporation, the Fifth Circuit looked to Rule 17 and explained that "[b]ecause the Federal Rules of Civil Procedure address this prudential standing requirement, they govern our inquiry."  171 F.3d at 320.  Rule 17 itself prescribes the means of correcting a Rule 17 violation:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

FED. R. CIV. P. 17(a)(3).  As explained below, what happened in this case tracks the rule quite well:  There was an objection based on a real-party-in-interest defect within a reasonable time (within a few months), there was a ratification of the action by the real party in interest, and now, the action is going to proceed as if it had been originally commenced by the real party in interest.

To get to its holding, the Court will analyze: (1) whether the post-complaint assignments of the causes of action from Meadows at Buda and Meadows at Kyle I to the Individual Plaintiffs successfully ratified them as the real parties in interest in this suit, and, if so, (2) whether this case should be treated "as if it had been originally commenced by the real party in interest" under Rule 17(a)(3).  These questions are decisive for the Individual Plaintiffs:  If this "relation back" were not permitted, then the Individual Plaintiffs would have to be dismissed from this suit with prejudice, because a new suit for nondischargeability would be time-barred under Federal Rule of Bankruptcy Procedure 4007.

ii.    Assignment and Ratification

There is no doubt that assignments can transform a party into the "real party in interest." *See, e.g.*, *Decorative Ctr. of Houston v. Direct Response Publ'ns*, 264 F. Supp. 2d 535, 543-44 (S.D. Tex. 2003) (rejecting argument that "a party cannot cure a standing defect by subsequent assignment"); *Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC*, No. 3:12-CV-0149-D, 2013 WL 3834626, at *3 (N.D. Tex. July 25, 2013) (noting that a plaintiff who is not the correct party in interest "could become the real party in interest through an assignment"); *S. County Mut. Ins. Co. v. Ochoa*, 19 S.W.3d 452, 465 (Tex. App.—Corpus Christi 2000, no pet.) ("[W]hen a cause of action is assigned or transferred, the assignee becomes the real party in interest with the authority to prosecute the suit to judgment."); *Integon Life Ins. Corp. v. Browning*, 989 F.2d 1143, 1153-54 (11th Cir. 1993) (finding a successful ratification based on an affidavit from the original party in interest).  Indeed, causes of action under § 523 of the Bankruptcy Code have been successfully assigned by one real party in interest to another.  *Turbo Aleae Invs. v. Borschow (In re Borschow)*, 467 B.R. 410, 419 (W.D. Tex. 2012) (holding that "an assignee of a debt can step into the shoes of the original creditor for purpose of § 523(a)(2)(A)"); *Sierra Chems. v. Mosley (In re Mosley)*, Adv. No. 12-1166-T, 2013 WL 1137061, at *3 (Bankr. D.N.M. Mar. 19, 2013) (collecting cases and holding that an assignment can support a § 523 claim).

Plaintiffs assert that the assignments here amount to a "ratification" of the suit, in compliance with Rule 17(a)(3).  They argue that "[Meadows at] Buda and [Meadows at] Kyle I acknowledge the existence of this suit and have ratified its maintenance by the Plaintiffs, who are now the real parties in interest."  Pl. Reply to Def. Resp. to Pl. M.S.J. on Affirm. Defs., 6.

Ratification requires the ratifying party to agree to the lawsuit's continuation and be "bound by any settlement or judgment."  *Wieburg*, 272 F.3d at 307.  One of the cases that has

37

been relied upon by the Fifth Circuit summarized the requirements of ratification thus: "A proper ratification under to Rule 17(a) requires the ratifying party to: 1) authorize continuation of the action; and 2) agree to be bound by the lawsuit's result." *Naghiu v. Inter-Continental Hotels Grp, Inc.*, 165 F.R.D. 413, 421 (D. Del. 1996); *see Wieburg*, 272 F.3d at 307. To be successful, a purported ratification must give a defendant "assurance . . . that the principle of res judicata will protect it from having to defend itself against the claims once again in a later action" by the real party in interest. *Wieburg*, 272 F.3d at 307.

As noted above, the assignments here transfer to the Individual Plaintiffs all of Meadows at Buda's and Meadows at Kyle I's "right, title, and interest" in their legal claims against Whittington and numerous of his associates. Pl. M.S.J. on Affirm. Defs., Exs. 56, 57. This broad assignment meets the test for ratification. It authorizes the Individual Plaintiffs' continuance of the action, binds the assignor partnerships to the results of this case, and prevents Whittington from having to defend himself "against the claims again in a later action." *Wieburg*, 272 F.3d at 307. Meadows at Buda and Meadows at Kyle I have ratified the Individual Plaintiffs' pursuit of this cause of action.

### iii.  "Understandable Mistake"

Once the Court has decided that the real party in interest has ratified the action, the language of the rule might seem mandatory: "[T]he action proceeds" as if the real party in interest had commenced it originally; in other words, the post-ratification suit should relate back to the time the suit was originally filed. FED. R. CIV. P. 17(a)(3). But, relying in part on the guidance of the advisory committee on the federal rules, Fifth Circuit law "has put a gloss on Rule 17's unqualified language. It holds that a plaintiff must have a reasonable basis for naming the wrong party to be entitled to ratification, joinder, or substitution." *Magallon v. Livingston*,

453 F.3d 268, 273 (5th Cir. 2006); *Wieburg*, 272 F.3d at 308 ("According to the Advisory Committee's Notes, this provision was added 'simply in the interests of justice' and 'is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made.'" (quoting FED. R. CIV. P. 17(a), advisory committee's notes, 1966 Amendment)).

When the *Wieburg* case returned to the Fifth Circuit after remand, the court, summarizing its prior opinion, stated: "To avoid dismissal . . . a plaintiff who is not the real party in interest must show, first, that he sued in his own name based on an understandable mistake and, second, that he did not have a reasonable time to correct the pleading deficiency." *Wieburg v. GTE Sw., Inc.*, 71 F. App'x 440, 2003 WL 21417074, at *2 (5th Cir. 2003) (unpublished) (citing *Wieburg*, 272 at 308). Without an "understandable mistake," or if ratification was unreasonably delayed, a court must dismiss the suit insofar as the real party in interest is absent.

Determining whether the failure to properly plead was an "understandable mistake" requires analysis of the particular circumstances that led to the failure, as well as the steps taken to correct the mistake. *See, e.g.*, *Magallon*, 453 F.3d at 273 (finding that a counsel's "belief, not wholly unfounded, that [defendant] . . . was incompetent" was a sufficiently "reasonable explanation" to avoid dismissal); *Jacobson v. Ormsby (In re Jacobson)*, 67 Fed. R. Serv. 3d 1310, 2007 WL 1644346, at *14 (W.D. Tex. 2007) (declining to "second-guess" the bankruptcy's court's "credibility determination" concerning the plaintiff's "understandable mistake" in not naming the correct party); *Asset Funding Grp., LLC v. Adams & Reese, LLP*, No. CIV-A-07-2965, 2009 WL 799752, at *4-5 (E.D. La. Mar. 23, 2009) (collecting cases and explaining that "cases in which the court has chosen dismissal over joinder or ratification have found lack of an understandable mistake because of deliberate, and often deceitful or at least

self-serving, actions of the plaintiff"); *Delor v. Intercosmos Media Grp., Inc.*, 232 F.R.D. 562, 568 (E.D. La. 2005) (finding that "plaintiff's problems are of his own making, due largely to his intentional misrepresentations to opposing counsel and this Court" and denying leave to amend complaint to name proper party); *Silva v. Grp. Practice Affiliates*, 125 F. App'x 541, 542 (5th Cir. 2005) (unpublished) (finding no abuse of discretion in dismissal, because plaintiff "was informed several times that his claims . . . were the property of the bankruptcy estate" and therefore required ratification, joinder, or substitution of Chapter 7 Trustee); *Isbell v. DM Records, Inc.*, No. 4:07-CV-146, 2009 WL 792415, at *1 (E.D. Tex. Mar. 24, 2009) (finding plaintiff's mistake was not "reasonable given the clear import of the language used in the contract" between him and the proper party, and finding that, because he waited until four months after defendant's answer and also after its motion to dismiss had been filed, he "did not act within 'a reasonable time' in seeking to add" the proper plaintiff); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2013 WL 2189865, at *6 (S.D. Tex. May 16, 2013) ("Here there was no 'understandable mistake' as Plaintiffs knew all along that they did not own the note at the time they filed suit and they knew who did."); *Lexxus Int'l, Inc. v. Loghry*, 512 F. Supp. 2d 647, 660-62 (N.D. Tex. 2007) (dismissing after long delay with no effort to intervene by real party in interest). As these cases reflect, dismissal is usually found warranted when the plaintiff has been deceitful, dilatory, or strategic in making or in failing to correct a Rule 17 problem. Such mistakes are not "reasonable." In addition, a mistake on an obvious point is not "understandable." That said, the standard is not overly strict; the case law demonstrates that the Fifth Circuit's "gloss" does not function as some sort of high, extratextual hurdle. The gloss is merely a way of making sure that the rule serves "the interests of justice," as the advisory committee and the *Wieburg* court put it, 272 F.3d at 308, and not the narrow

40

interests of a calculating plaintiff.

Plaintiffs have provided no real argument concerning how "understandable" their mistake was. Nonetheless, the record is clear in several respects. First, there was little delay between the Individual Plaintiffs' being alerted to their error and their remedying it. Plaintiffs' amended complaint [Dkt. No. 6] was filed on September 16, 2013. Whittington's answer, which raises the issue of standing, was filed on October 16, 2013. Answer [Dkt. No. 19], ¶¶ 5-6, 42-43, 61. Uncontroverted deposition testimony shows that while the assignments bear earlier dates, they were actually executed in November of 2013. *See* Duncan Dep., 67; Gist Dep., 29-31. Plaintiffs' first motion for partial summary judgment was filed December 6, 2013, and it discusses and attaches the assignment documents. *See* Pl. M.S.J. on Affirm. Defs., 2-5, Exs. 56-57. In other words, the mistake was corrected quickly, thus preventing any prejudice to Whittington or any delay to this proceeding. Whittington has not argued that he was in any way prejudiced or strategically disadvantaged because of the timing of the assignments.

In addition to being promptly remedied, the mistake is of a relatively technical nature, by no means as plain or obvious as many of the mistakes that have caused courts to dismiss cases. Since (as noted above) there is no doubt but that the limited partners in this situation suffered an "injury in fact," and that fiduciary duties ran from Whittington to the Individual Plaintiffs as individual limited partners in addition to each Investor Partnership, their apparent conviction that they could bring suit in their own names seems reasonable and understandable—even if, under Texas law, it is mistaken.[16] Nor is there any evidence that Plaintiffs were aware of the defect before filing suit and simply ignored it; indeed, their prompt correction suggests that they could

---

[16]  Indeed, Whittington himself may have made a similar "jump" past the partnerships and to the limited partners: Whittington's bankruptcy schedules list several of the Individual Plaintiffs as unsecured creditors with disputed claims apparently emerging from the Investor Partnerships. *See* Case No. 13-11036, Dkt. No. 1, Sch. F.

and would have had the claims assigned to them earlier if they had been aware of the problem.

Whittington points to a statement of experience that Plaintiff Gary Duncan put in the record, and he argues that Plaintiffs' mistake should not be considered understandable because the statement shows that "Duncan is an extremely experienced and talented commercial trial lawyer." *Id.* In fact, however, as far as the statement of experience reveals, Duncan has neither a license to practice in Texas nor experience with Texas law, nor does his experience appear directly pertinent to assessing the questions of partnership law relevant here. *See generally* Dkt. No. 49, Ex. A, 10-16 (reflecting a career focused on plaintiff's law since 1979). The mistake made by Plaintiffs in this case resembles that made in *Asset Funding Group*, in which the plaintiff failed to include some affiliate entities to whom particular claims belonged, and in which the plaintiff moved promptly to correct the mistake and was permitted to do so by the court. 2009 WL 799752, at *4-6. Here, as in *Asset Funding Group*, the technical nature of the mistake and the speedy correction speak in Plaintiffs' favor.

As limited partners aggrieved by the general partner of the partnership, Plaintiffs' mistake in seeking to sue in their own names was understandable. There is no hint of strategic manipulation in the record, nor is there a reason to think the assignments could not have been executed earlier if the need for them had been recognized. Nor does the alteration appear to have caused any prejudice or vexation to the defendants. Whittington has failed to provide any reason to doubt any of this. Thus, the Court holds that the Individual Plaintiffs are now the real parties in interest with respect to the Meadows at Buda transaction and Meadows at Kyle I transaction.

   iv. Relation Back, "Dead" Causes of Action, and Bankruptcy Rule 4007

The remaining issue is whether the lawsuit (as ratified) "relates back" to the time the complaint was originally filed. There is no merit in Whittington's argument that because the

Individual Plaintiffs were not the real parties in interest at the inception of this lawsuit, they cannot be made so after the fact, or that that their alteration in status cannot "relate back" to the date of the original complaint.  Courts commonly allow "relation back" of Rule 17(a) corrections of the real party in interest, including in situations where plaintiffs' claims would otherwise be time-barred.  *See, e.g.*, *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18-21 (2d Cir. 1997) (reversing dismissal by the district court and allowing amendment under Rule 17, which would relate back to time of original complaint, even though statute of limitations had since run); *Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1270-71 (10th Cir. 1997) ("[T]he language of [Rule 17] . . . mandated that, once the district court concluded the tenants were real parties in interest and allowed them to join as plaintiffs, their claims automatically related back to the original filing of the action."); *Eaton v. Taskin, Inc.*, No. 07-3056, 2007 WL 2700554, at *6 (C.D. Ill. July 20, 2007) (allowing substitution of proper party in interest after state statute of limitations would have run and permitting relation back to original date of filing of complaint); *In re Vivendi Universal, S.A. Secs. Litig.*, 605 F. Supp. 2d 570, 582-85 (S.D.N.Y. 2009) (allowing time for real parties in interest to join, substitute, or ratify; explicitly rejecting the argument that plaintiff "must have had standing at the time an action was brought" and that, consequently, "only assignments made prior to the commencement of this suit can possibly establish that Individual Plaintiffs have standing to sue").

Given this clear law, Whittington's only hope is to argue that there is something particular to non-dischargeability actions that would alter this usual practice.  But contrary to his arguments, Bankruptcy Rule 4007 requires no special treatment in this respect.  Missing the deadline for an objection to discharge is not a "jurisdictional" defect and may be waived if not timely made.  *Kontrick v. Ryan*, 540 U.S. 443, 447 (2004) (holding that failure to comply with

Bankruptcy Rule 4004 may be waived); *id.* at 448 n. 3 (acknowledging that Bankruptcy Rule 4007 establishes "essentially the same time prescriptions" for denial-of-discharge actions as Bankruptcy Rule 4004 for dischargeability-of-a-debt deadlines, and that cases concerning one rule have been applied to the other); *Owen v. Miller (In re Miller)*, 333 B.R. 368, 371 (Bankr. N.D. Tex. 2005) (applying *Kontrick* to Bankruptcy Rule 4007 context, citing to other courts that have done so, and noting that "[b]ecause the language of the two rules is virtually the same, the Court . . . concludes that the sixty-day deadline of Rule 4007(c) is not jurisdictional"), *aff'd*, No. 04-80905-HDH-7, 2006 WL 6507922 (N.D. Tex. Mar. 28, 2006).

The nondischargeability context does not differ from the other situations in which Rule 17 has been applied to permit a claim to proceed when it would otherwise be barred by the statute of limitations.  It is true that the filing deadline of Bankruptcy Rule 4007 is interpreted strictly.  "The strict time limitation placed upon creditors who wish to object to a debt's dischargeability reflects the Bankruptcy Code's goal of providing debtors with a fresh start." *State Bank & Trust, N.A. v. Dunlap (In re Dunlap)*, 217 F.3d 311, 315 (5th Cir. 2000); *Neeley v. Murchison*, 815 F.2d 345, 347 (5th Cir. 1987) (stating that Rule 4007 "places a heavy burden on the creditor to protect his rights").  But Bankruptcy Rules 4004 and 4007 can be and have been harmonized with other principles and rules without losing their strictness.  *See, e.g.*, *Coston v. Bank of Malvern (In re Coston)*, 987 F.2d 1096, 1099 (5th Cir. 1992) (holding that the deadline ran from the *second* setting of § 341 meeting when the initial proceedings were stayed due to the pendency of a related action in another state); *Dunlap*, 217 F.3d at 314-17 (holding that the "first date set" for creditors meeting does not mean the date set in the first notice if circumstances (like dismissal or an order of abatement) prevent creditor from filing timely complaint objecting to discharge); *Official Comm. of Unsecured Creditors of the Project Grp., Inc. v. Crawford (In re*

*Crawford)*, 347 B.R. 42, 48 (Bankr. S.D. Tex. 2006) (looking to *Neeley*, 815 F.2d at 347 n. 5, to support the "conclu[sion] that the Fifth Circuit would follow the Sixth, Eighth, Ninth, and Tenth circuits in holding that an affirmative misstatement of the deadline [for objecting to discharge] extends the deadline . . . ."); *In re Castleman*, No. 10-36376-SGJ-7, 2011 WL 925567, at *3-4 (Bankr. N.D. Tex. 2011) (reaching same result as *Crawford*).

The Court does not believe that Federal Rule 17 conflicts with Bankruptcy Rule 4007, be it however so strict. The rules are compatible, and both should be given force. What was in doubt here was the real-party-in-interest requirement of Federal Rule 17, not the timeliness requirement of Bankruptcy Rule 4007. As the Fifth Circuit has explained, a purpose of the strict time limits of Bankruptcy Rules 4004 and 4007 is "to promote the expeditious and efficient administration of bankruptcy cases by assuring participants in bankruptcy proceedings 'that, within the set period of 60 days, they can know which *debts* are subject to an exception to discharge.'" *Grossie v. Sam (In re Sam)*, 894 F.2d 778, 781 (5th Cir. 1990) (quoting *Neeley*, 815 F.2d at 347-48) (emphasis added); *see also Dunlap*, 217 F.3d at 315 (quoting same language); *Eric D. Fein, P.C. & Assoc. v. Young (In re Young)*, 425 B.R. 811, 817 (Bankr. E.D. Tex. 2010) (quoting same language); *Laboratory Corp. of Am. v. Avalos (In re Avalos)*, 361 B.R. 129, 132 (Bankr. S.D. Tex. 2007) (quoting same language); *FDIC v. Meyer (In re Meyer)*, 120 F.3d 66, 68 (7th Cir. 1997) ("The force of Rule 4007(c) . . . should fall first and foremost on whether a complaint was filed against a specific debt, not so much on who makes the complaint."). As this oft-quoted language reflects, participants in bankruptcy proceedings need to know which *debts* are being challenged—not necessarily *who* is challenging them. The "who" is, under Federal Rule 17, correctable after the fact. Here, for instance, whether the Individual Plaintiffs brought this action on their own behalf as limited partners or on behalf of the Investor Partnerships as

assignees would appear to be of no importance to any participant in Whittington's bankruptcy. The alleged debt against which the complaint was filed, however, was a very important fact—and was the subject of a timely complaint.

Numerous cases, addressing the issue in various circumstances, support the Court's holding as to the intersection of Federal Rule 17 and Bankruptcy Rule 4007. These cases have allowed relation back after the correction of a "real party in interest" defect, including where the Bankruptcy Rule 4004 or 4007 deadlines would have been missed but for the relation back, where there is no prejudice to the defendant, and where Rule 17's requirements are met. One leading case is *Meyer*, out of the Seventh Circuit. 120 F.3d at 68. In *Meyer*, due to a chain of bank failures and takeovers, a large, non-dischargeable claim against the debtor had passed through the hands of numerous entities. One of these former creditors sought extension of the Rule 4007 deadline, and ultimately filed a timely complaint. It was not until almost a year later that, prompted to recognize its error by the debtor's objection, it substituted in the correct party in interest as the plaintiff. The court noted that the original complaint, while defective as to the party in interest, "put [defendant] . . . on notice" that "some creditor in a daisy chain would contest the discharge" of the debt in question. *Id.* at 68. The court noted also that no prejudice was even alleged as a result of the "nominal error." *Id.*

There are numerous other, similar cases. *See, e.g.*, *Capobianco v. Trew (In re Capobianco)*, 248 B.R. 833, 836-41 (B.A.P. 9th Cir. 2000) (allowing substitution of proper party in interest after Bankruptcy Rule 4007 bar date); *First Mutual Bank. v. Briceno (In re Briceno)*, Adv. No. 08-1110, 2009 WL 9084775, at *2-3 (Bankr. N.D. Cal. May 12, 2009) (allowing adversary proceeding to proceed with new plaintiff, the real party in interest, after the objection to discharge deadline had passed, and noting that there would be "no surprise" and "no

46

prejudice" to the debtor); *Mid-Century Ins. Co. v. Haddon (In re Haddon)*, No. 99-40572, 2000 WL 33712480, at *2-4 (Bankr. D. Idaho Apr. 12, 2000) (allowing relation back of amended complaint by actual party in interest to date of filing of original complaint by incorrect party; noting that "[t]he proper focus of the Rule 4007(c) time bar should be the nature of the debt, rather than the identity of the claimant," that defendants had "sufficient notice of the claims being asserted," and that "[i]t is of no significant consequence to Defendants which entity asserts the claims").

For these reasons, the Court concludes that Plaintiffs meet the requirements of both constitutional and prudential standing, and that they may continue as Plaintiffs in this cause of action as if they were the real parties in interest as of the date the complaint was originally filed.

### 2. Statute of Limitations

Under Texas law, claims for breach of fiduciary duty must be brought within four years of the alleged breach. Tex. Civ. Prac. & Rem. Code § 16.004(a)(5); *Suter v. Univ. of Tex. at San Antonio*, 495 F. App'x 506 (5th Cir. 2012) (unpublished). Usually, causes of action, including breaches of fiduciary duty, "accrue[ ] when a wrongful act causes an injury, regardless of when the plaintiff learns of that injury." *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). As noted above, the Finley Property closing was June 11, 2004; the Hale Property closing was June 15, 2004; the Whitten Property closing was December 16, 2005; and the Perron Property closing was August 8, 2006. *See supra* note 4. If each claim accrued when each transaction occurred, as per the usual rule, then these claims—which were not brought until August 26, 2013, over seven years later—would be barred by the statute of limitations. For this reason, Whittington has moved for summary judgment on grounds that Plaintiffs' claims are time-barred.

Plaintiffs respond that the "discovery rule" defers accrual of their claim against Whittington. The Fifth Circuit has noted that "[u]nder Texas law, the discovery rule is an exception to the general rule that a cause of action accrues when a wrongful act causes some legal injury." *TIG Ins. Co.v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008); *see S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). "When applied, the discovery rule 'defer[s] accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action.'" *TIG*, 521 F.3d at 357 (quoting *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998)); *see also Computer Assocs.*, 918 S.W.2d at 455.

A close companion to the discovery rule—and sometimes conflated with it—is the principle that estops a defendant from relying on a statute of limitations defense in cases "in which the wrongdoing is fraudulently concealed." *S.V.*, 933 S.W.2d at 7. As the Texas Supreme Court has explained:

> The doctrine of fraudulent concealment provides that where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence.

*Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 n. 1 (Tex. 1990).

In its thorough discussion of these linked principles in the case of *S.V. v. R.V.*, the Texas Supreme Court, after surveying numerous cases, noted that Texas courts "have sometimes used the phrase ['discovery rule'] to refer generally to all instances in which accrual is deferred, including fraud and fraudulent concealment," and that "[a]t other times we have distinguished between fraudulent concealment and the discovery rule." 933 S.W.2d at 4. The Texas Supreme Court stated that it would "observe the distinction between the two categories because each is

48

characterized by different substantive and procedural rules," but the court explained that in both categories, "the general principle is this:  accrual of a cause of action is deferred in cases of fraud or in which the wrongdoing is fraudulently concealed, and in discovery rule cases in which the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Id*. at 4, 6.

### a.  Fraudulent Concealment

Plaintiffs cited the "discovery rule" as their response to the statute of limitations defense, but they may also be entitled to deferral of the limitations on grounds of fraudulent concealment, which courts have characterized as "[t]he equitable estoppel effect of fraudulent concealment." *A.W. v. Humble Indep. Sch. Dist.*, No. H-13-3551, 2014 WL 2611810, at *11 (S.D. Tex. June 11, 2014).  To benefit from estoppel, Plaintiffs must show "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Id*.  (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998)).

While the preceding sections demonstrate that elements (1), (2), (3), and (5) are easily met, element (4) requires further analysis.  Even if a plaintiff is "without knowledge," this element has been held to require "reasonable diligence" in investigation.  "In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated." *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 205 (Tex. 1957); *see Kerlin v. Sauceda*, 263 S.W.3d 920, 925 (Tex. 2008) (requiring "exercise of reasonable diligence").  Of course, here, the parties were not transacting on an arm's-length

basis, because they were within a fiduciary relationship.  While "diligence in discovering the breach of fiduciary duty or fraud is required" in a fiduciary relationship as in an arm's-length relationship, nonetheless, the presence of a fiduciary relationship "affects . . . the application of the rule." *G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc.*, 219 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.); *Douglass v. Langehennig (In re Douglass)*, Adv. No. 08-1007, 2008 WL 2944568, at *12 (Bankr. W.D. Tex. July 25, 2008) (holding that fiduciary relationship should be a consideration in "determining whether the fraud might have been discovered through reasonable diligence" (quoting *Powers v. McDaniel*, 785 S.W.2d 915, 918 (Tex. App.—San Antonio 1990, writ denied)).  "Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved." *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988); *see Courseview*, 312 S.W.2d at 205 ("[L]imitation does not begin to run in favor of a trustee and against the cestui until the latter has notice of a repudiation of the trust, and there is no duty to investigate at least until the cestui has knowledge of facts sufficient to excite inquiry."); *Dernick Res., Inc. v. Wilstein*, 312 S.W.3d 864, 880-83 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (collecting cases and holding in favor of beneficiary of a fiduciary relationship).  In one leading case, the Texas Supreme Court stated:

> [A fiduciary relationship] may excuse the defrauded party from taking action that would be required in an arm's-length transaction or from making as prompt or searching investigation as might otherwise be expected.  In some situations there is no legal duty to use means available for discovering the fraud . . . .  We are not prepared to say, however, that one in a relationship of trust and confidence is always justified as a matter of law in neglecting every precaution until something occurs to arouse his suspicions.

*Courseview*, 312 S.W.2d at 205; *Duthu v. Pena*, 228 F.3d 409, 2000 WL 1056126, at *7-9 (5th Cir. 2000) (unpublished) (collecting cases).

This case presents precisely the sort of intentional concealment of ill-gotten profits (in the

face of a duty to disclose such profits) that allows a plaintiff to benefit from equitable estoppel. *See Borderlon v. Peck*, 661 S.W.2d 907, 908 (Tex. 1983) (holding that because a physician has a duty to "disclose a negligent act or fact that an injury has occurred," and physician failed to do so, cause of action was deferred until victim learned of the right of action); *Gibson v. Burkhart*, 650 S.W.2d 183, 188-89 (Tex. App.—Corpus Christi 1983) (applying doctrine to estop statute of limitations defense when fraud arose within fiduciary relationship); *Zimmerman v. First Am. Title Ins. Co.*, 790 S.W.2d 690, 699 (Tex. App.—Tyler 1990) (same).  As discussed extensively in the preceding sections of this opinion, Plaintiffs have more than met their "burden of coming forward with proof to support the allegation" of Whittington's fraudulent concealment of the facts underlying Plaintiffs' causes of action.  *Weaver v. Witt*, 561 S.W.2d 792, 793 (Tex. 1977) (noting that burden of proof to support fraudulent concealment allegations is on plaintiff).

Against this view, Whittington argues that Plaintiffs could and should have investigated more than they did.  Whittington points to the fact that Gunn revealed the side-profits scheme to Plaintiffs in 2010, and he reasons that "[i]f [Plaintiff Gary Duncan] . . . had just asked William Gunn, [Whittington's] . . . partner, in 2006 he would have gotten the information he needed." Def. Resp. to Pl. M.S.J. on Affirm. Defs., ¶ 32.  Similarly, he suggests that Plaintiffs "could have followed up with the title companies" to discover the true destination of their investment funds, back at the time of the transactions.  *Id*.  But the uncontroverted evidence is that Gunn and Whittington had consciously chosen *not* to reveal their profiteering scheme, and that Gunn revealed it only after he himself felt betrayed or ill-treated by Whittington, years after the transactions.  Pl. M.S.J. on Affirm. Def., Duncan Aff., ¶ 11, Gunn Aff., ¶¶ 7-8.  It is true that now, long after the fact, Gunn's retroactive deposition testimony is that, if he had been called in 2006, he "probably would have had to tell" Duncan about the scheme.  Gunn Dep., 43.  But this

51

half-hearted statement is preceded by several pages that cast considerable doubt on it: There is equivocation on Gunn's part ("I cannot speculate on a hypothetical"), acknowledgement of a powerful financial motivation to keep the details concealed ("My excuse for not doing it was . . . we had many big loans that were pending," and were worried disclosure would "have maybe forced [Duncan] . . . to protect himself with his partners . . . . [W]e had some 10,000 lots with rotating loans at all times, so I chose not to say anything."), and even personal pressure from Whittington's attorney ("I have dealt with you for years and I know you to be an honest and upstanding person. . . . And that's why I'm asking you this question. In your heart, do you believe you would have told [the truth] . . . ?"). Gunn Dep., 40-43.

But even crediting Whittington's assertion that Plaintiffs could have discovered the truth simply by asking Gunn, the Court cannot find that that Plaintiffs were obliged to engage in such an investigation. As the evidence shows, great care was taken to make sure that a parallel set of documents was produced to hide the side profits. The only conceivable "red flag" was the partially redacted Meadows at Kyle II/Perron Property contract that was sent to Plaintiff Gary Duncan. Far from "neglecting every precaution," Duncan followed up on this surprising document by specifically asking Whittington if he was receiving a side profit on the deal. Whittington answered that he was not. Whittington's suggestion that Duncan should have distrusted his fiduciary and sought more details from Gunn or from the relevant title companies is difficult to sustain—even construing the facts fully in Whittington's favor. "[Whittington] cannot lie to his potential investors . . . and then, when the lies are discovered, cry foul because they should have known better than to trust him." *Ward Family Found. v. Arnette (In re Arnette)*, 454 B.R. 663, 687-88 (Bankr. N.D. Tex. 2011). Whittington apparently admitted to Duncan that there was a gap between the purchase price and the price the Investor Partnership

was paying, and thus implicitly acknowledged that someone involved in the purchase was taking a developer's or finder's fee out of the purchase price. But he denied, when directly asked, that he was taking a piece of this excess. Thereafter, the Perron Property payments were structured so as to hide Whittington's cut: They were made through an intermediary (Gannaway) who then paid them into the trust fund of a lawyer (Jesse Whittenton), from which they were paid to Whittington or Whittington's fully owned entity, Madras. *See* Pl. M.S.J. on Liab., Exs. 48, 52, 53. In other words, far from being apparent, this fraud was covered over with great care. Even if a thorough investigation might have yielded insight into the discrepancies between the different sets of sale documents and allowed Duncan to clear his way through this layered fraud, Plaintiffs had no reason to engage in such investigation at the time of the transactions, or at any time before they were given more reason to be suspicious, in 2010.

In the cases where courts have denied equitable estoppel despite fraud by a fiduciary, the parties have been informed of at least some particulars indicating suspicious or fraudulent behavior. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623-24 (Tex. 2011) (declining to apply fraudulent concealment doctrine because plaintiffs were aware of numerous suspicious facts underlying their cause of action); *Doe v. Henderson Indep. Sch. Dist.*, 237 F.3d 631, 2000 WL 1701752, at *4-5 (5th Cir. 2000) (unpublished) (denying equitable estoppel because plaintiffs were aware of the facts of the injury they suffered even if they did not fully appreciate its practical or legal consequences); *KPMG Peat Marwick v. Harrison County Housing Fin. Corp.*, 988 S.W.2d 746, 749-50 (Tex. 1999) (holding that once plaintiff knew it had suffered a large loss caused by the "wrongful conduct" of another and had sued its fund manager, it was on inquiry notice to investigate its auditor as well).

The case of *Thomas v. Barton Lodge II, Ltd.* provides a useful contrast to this case. 174

F.3d 636 (5th Cir. 1999).[17]  The relationships of the parties and some of the operative facts in *Thomas* are similar to those here; limited partners sued the general partner who stood on both sides of a transaction.  *Id*. at 639-40.  The allegations in that case were essentially that the general partner benefitted from the sale of the partnership-owned property to the detriment of the limited partners and that the partnership agreement required unanimous consent that the general partner never obtained.  *Id*. at 641-42.  The court noted that the general partner sent a letter that "informed the limited partners that the project would be sold in the face of foreclosure, that the sale likely would result in considerable losses to the limited partners, and that the purchasers . . . were affiliated with the general partner."  *Id*. at 647.  This put the limited partners on notice that they needed to investigate.  One of the limited partners stated at the time that he "plan[ned] to consult [his] attorney about legal remedies."  *Id*. at 640.  Finding that fraudulent concealment did not apply, the court stated "[the limited partners] had enough knowledge to investigate and a reasonable investigation would have led the partners to file a claim in court."  *Id*. at 646.  A letter disclosing a self-interested transaction that results in significant losses to sophisticated investors should provide the basis for those investors to investigate whether there may be potential fraud.  *Id*. at 647.  *Thomas* provides a revealing contrast in several ways:  the relative candor of the general partner in providing information about the potential self-dealing to the limited partners, and the relative amount of suspicion-inducing knowledge that the limited partners received.  Here, Whittington exhibited no such candor, and Plaintiffs possessed much less suspicion-inducing knowledge.  And the Court finds no cases holding that a limited partner should not be able to trust a general partner when the limited partner, confronted with a document that raised

---

[17] For clarity, the statute of limitations for breach of fiduciary under Texas law (as interpreted by the Fifth Circuit) was, at the time of *Thomas*, two years.  *See id*. at 645.  Texas law was subsequently amended, and four years is now the limitations period for breach of fiduciary duty claims.  Tex. Civ. Prac. & Rem. Code § 16.004(a)(5); *Suter*, 495 F. App'x at 509 (unpublished).

some suspicions, investigates by asking direct questions of the general partner, who provides a facially sufficient and non-suspicious explanation.  Without further reason for suspicion, such an investigation suffices.

Typically, application of the fraudulent concealment doctrine requires fact-specific inquiries into reasonableness.  But on this record, even with all facts construed in Whittington's favor, no reasonable fact-finder could hold that Plaintiffs "knew or should have known of [their] . . . wrongful injury."  *USPPS, Ltd. v. Avery Dennison Corp.*, 326 F. App'x 842, 848-50 (5th Cir. 2009) (unpublished).  Without more reason for suspicion, Plaintiffs were entitled to trust the documents and explanation provided by their fiduciary Whittington.  Equitable estoppel applies under these circumstances.

   b.   Discovery Rule

Even if the application of the statute of limitations were not equitably estopped by virtue of fraudulent concealment, the discovery rule would apply.

"The determination of whether the discovery rule applies to a particular cause of action is a question of law."  *TIG*, 521 F.3d at 357; *see also Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 567 (Tex. 2001) ("[W]hen a cause of action accrues is a question of law, not fact."); *Computer Assocs.*, 918 S.W.2d at 456 (declining to extend discovery rule to misappropriation of trade secret cases).  "Importantly, the Texas [Supreme] court explained that whether the discovery rule applies is determined *categorically*," by general inquiry into the relevant *type* of injury, as opposed to factual inquiries regarding a specific injury.  *TIG*, 521 F.3d at 358 (citing *HECI*, 982 S.W.2d at 886); *cf. Kerlin*, 263 S.W.3d at 925-26 (noting that "the discovery rule differs from fraudulent concealment in that its applicability is determined on a categorical basis").  Under the "categorical approach," the Court analyzes the aspects of a cause

of action to determine whether such actions should benefit from the discovery rule.

Even if the discovery rule applies to a cause of action "categorically," the delayed accrual of the claim can present fact issues—including what would have been a reasonably diligent investigation under the circumstances of a particular case. *See, e.g.*, *Willis*, 760 S.W.2d at 647 (deciding as a matter of law that the discovery rule applied to attorney-client negligence cases, and then stating that "the claimant has the burden of pleading and proving facts suspending operation of a statute of limitations"); *Barker v. Eckman*, 213 S.W.3d 306, 312 (Tex. 2006) (refusing to find that the trial court "could have determined that the discovery rule applied as a matter of law under the state of pleadings and the record" because "exactly when [plaintiff] should have known [of the wrong] . . . was disputed"). Here, for purposes of ruling on Plaintiffs' summary judgment motion, the Court construes fact issues in Whittington's favor. As discussed in the preceding section, that means that the Court will accept Whittington's assertions that Gunn would have told the truth earlier if he had been asked about the side profits by Plaintiffs, and that an investigation of the documents with the title company could eventually have led Plaintiffs to discover the well-hidden destinations of significant portions of their investments. The discussion that follows assumes those facts are true.

In order to determine the discovery rule's applicability, Texas law requires "that the nature of the injury must be inherently undiscoverable and that the injury itself must be objectively verifiable." *Id.* (quoting *HECI*, 982 S.W.2d at 886).

There is no dispute over the second requirement, that the injury be objectively verifiable. The cases where courts have found this element lacking are, for instance, cases where subjective impressions and extensive expert testimony are required to establish an injury. *See generally S.V.*, 933 S.W.2d at 7-8 (collecting and discussing cases). By contrast, cases where documents,

records, or other objective evidence reflect the injury—including injury by self-dealing, misrepresentation, and breach of fiduciary duty—courts have held that the "objectively verifiable" element is met. *See id.* Whittington's self-dealing is, as Plaintiffs put it, "a prototypical example of an objectively verifiable injury." Pl. M.S.J. on Affirm. Defs., 12. Whittington did not contest this element in his responsive briefs, and the Court holds that Plaintiffs have fulfilled its requirement.

The other element of the discovery rule test requires that the injury be "inherently undiscoverable." "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *S.V.*, 933 S.W.2d at 7. Courts have suggested that "the requirement that the injury be 'inherently undiscoverable' may be deemed satisfied when there is a fiduciary relationship between the plaintiff and defendant." *Douglass*, 2008 WL 2944568, at *12. "[T]he Texas Supreme Court has held that a fiduciary's misconduct may be inherently undiscoverable. . . . When the fact of a fiduciary's misconduct becomes apparent, the person owed the fiduciary duty is no longer relieved of the duty to exercise reasonable care and diligence to discover the existence of a cause of action." *West v. Proctor*, 353 S.W.3d 558, 566 (Tex. App.—Amarillo 2011, pet. denied); *see also S.V.*, 933 S.W.2d at 8 (citing *Willis*, 760 S.W.2d at 645; *Slay v. Burnett Trust*, 187 S.W.2d 377, 394 (Tex. 1945)). In sum, "although a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs" (and certainly cannot ignore "apparent" injuries), nonetheless, when there is a fiduciary relationship, "the nature of the injury is presumed to be inherently undiscoverable." *Computer Assocs.*, 918 S.W.2d at 456.

Looking to the facts of this case, Plaintiffs assert that they were unaware of any injuries until December 20, 2010, and Whittington does not contest that. Whittington claims that they

should have become aware of the wrongdoing earlier. But Whittington's suggestion that Plaintiffs could have asked Gunn concerning side profits or pressed an investigation with the title company does little to refute the presumption of inherent undiscoverability in this fiduciary context.[18] As discussed above, the *only* "red flag" here arose from the partially redacted Meadows at Kyle II transaction documents. It is important to note that even this flag was not very red; while the contract showed the sellers of the land receiving a significantly lower price than the investors were actually paying into the deal, Whittington provided a benign, facially sufficient answer to Duncan's concern. The "red flag" did not suggest that Whittington would be paid a cut of the discrepancy, nor did it provide any hint that two sets of closing documents were being prepared, with one to be hidden from Plaintiffs.

The Court disagrees with Whittington's idea that Plaintiffs had to look behind the answer of their fiduciary to ask the same questions of Gunn or of the title company, who did not owe them the same duties that Whittington did. Again, the relevant principle seems to be that "[Whittington] cannot lie to his potential investors . . . and then, when the lies are discovered, cry foul because they should have known better than to trust him." *Arnette*, 454 B.R. at 687-88. There was simply no reason Plaintiffs would have engaged in a further investigation, based on

---

[18] Even the public availability of documents indicating misconduct does not refute "inherent undiscoverability," when a fiduciary relationship is involved and is relied upon. *See Douglass*, 2008 WL 2944568, at *13. *Douglass* involved a married couple and a dispute over an interest in property, the deed to which was solely in the husband's name despite a contribution by the wife in the purchase of the property. *Id.* at *4. Judge Gargotta considered the recording of the deed as not "conclusively preclud[ing] a discovery rule or fraudulent concealment exception to a statute of limitations defense under Texas law where a plaintiff establishes a fiduciary or confidential relationship between the parties that prevented her from discovering the cause of action." *Id.* at *12. The court held that the recorded deed did not establish conclusively that the wife had notice of the claim. *Id.* at *13. Here, of course, Whittington's argument is not that public documents would have told the story, rather that inquiries with the title company concerning documents in its possession might have yielded more information and allowed Plaintiffs to uncover the fraud.

what they did know and had been told about the transaction—including, of course, both Whittington's direct lie as to his profit on the Meadows at Kyle II deal, as well as the "scrubbed" second set of documents produced for each transaction to hide the self-dealing. In light of this significant degree of cover-up, the wrongdoing was anything but "apparent" to Plaintiffs.

The cases cited by Whittington are not analogous. For instance, in the Fifth Circuit case of *Suter v. University of Texas at San Antonio*, a professor alleged that her university employer mishandled funds that were meant to support her in establishing a laboratory when she began employment with the university. 495 F. App'x 506, 510-11 (5th Cir. 2012) (unpublished). She alleged that university administrators failed to inform her of deadlines related to the availability and use of her research funds. But the professor had received a letter that highlighted that there was a schedule for when she needed to use her available funds; although the actual deadline was not specified, the letter put her on notice that there was a deadline, particularly because she could have inquired of the university or of the National Institutes of Health to request more information. *Id.* at 511. Importantly, the Fifth Circuit noted that there was no reason to think that if she had inquired, the university "would have misrepresented such information or otherwise withheld it from her." *Id.* Obviously, Whittington's breach is very different from the university's alleged breach in *Suter*, since he very clearly misled Plaintiffs—by affirmative misstatement, by intentionally withholding material information, and by the related document-based deceptions. To the degree they were put on notice by the Meadows at Kyle II/Perron Property contract, they investigated, and Whittington misrepresented the relevant information.

Even construing the contested facts in Whittington's favor, the discovery rule applies to this situation. It delayed the accrual of Plaintiffs' cause of action until they actually learned of their injury in 2010. Accordingly, Whittington's statute of limitations defense is denied.

### 3. Fraud/Unclean Hands/Laches

Whittington has alleged that certain equitable doctrines, namely fraud, unclean hands, and laches, should bar Plaintiffs' recovery. On these affirmative defenses, Whittington bears the burden of proof. *Elmo*, 2008 WL 2200265, at *1. Thus, for Plaintiffs to win summary judgment on these defenses, they must "point to the absence of any fact issue in the record, and the evidentiary burden shifts to the non-moving party to show with 'significant probative' evidence that there exists a triable issue of fact." *Century Savings & Loan*, 1994 WL 171463, at *2 (unpublished) (quoting *Celotex*, 477 U.S. at 322). Plaintiffs have pointed to the absence of fact issues concerning these claims, and Whittington must point to evidence of triable issues supporting his defenses.

The only factual basis on which Whittington suggests these doctrines should apply is Duncan's denying Whittington a promised commission for the September 2012 closing of a re-sale of the Meadows at Kyle I property. *See* Def. Resp. to Pl. M.S.J. on Affirm. Defs., ¶¶ 35-38; Duncan Dep., 57-58 (Duncan acknowledging that "[a]t some point I made a decision" not to pay Whittington's commission on the September 2012 deal). The parties settled this dispute, and the settlement provided in part that the commission that was owed to Whittington "was forfeited by you" (i.e., by Whittington), and that Whittington agreed to take a credit for $110,000 against whatever damages he owes to Plaintiffs. Pl. M.S.J. on Affirm. Defs., Ex. 59. Plaintiffs argue that whatever behavior on either side led up to that settlement, the settlement removes the September 2012 closing as the basis for any further claims against them based on it. This argument has considerable force. The settlement would seem to provide a resolution of any injury Whittington suffered in the September 2012 situation. Even so, the Court will provide analysis of some of the numerous other reasons that these defenses are doomed.

"The clean hands doctrine requires that one who seeks equity, does equity. Equitable relief is not warranted when the plaintiff has engaged in unconscionable, unjust, or inequitable conduct with regard to the issue in dispute." *Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App.—Fort Worth 2006, pet. denied) (internal citations omitted). "The clean hands doctrine should not be applied unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine." *Id*. Even crediting Whittington's account of the events fully, under the circumstances it is difficult to see how Plaintiffs' actions could be considered inequitable. Plaintiffs were in a tough spot due to what they discovered in 2010 concerning the earlier land purchases. They had discovered that their fiduciary had violated his duties, yet they were unavoidably involved in land partnerships with him and his associates. Some strategic behavior on their part is understandable and, as a matter of law, does not rise to the level of inequity. That fact is further underscored by the settlement agreement that the parties signed, which essentially resolved the September 2012 issues, i.e., the "wrong complained of." In addition, the settlement agreement undermines the notion that Whittington ever was or remained "seriously harmed" enough to trigger this doctrine. Finally, the relevant behavior, even if inequitable, is not sufficiently connected "to the issue in dispute," which is of course *not* the re-sale of the land by the partnership in September 2012, but rather its original sale to the partnership. Unclean hands is, here, no defense.

"The defense of laches requires proof of (1) a party's unreasonable delay in asserting a legal or equitable right, and (2) a good-faith detrimental change of position by another because of the delay." *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *3 (Tex. App.—Austin July 10, 2012, pet. denied) (unpublished). Whittington provides *no* explanation of what "good-faith detrimental change of position" was caused by Plaintiffs' delay in bringing this cause of

action.  Nor does he provide any reason to think the delay was unreasonable, given when the conduct actually came to light, and given the breach of trust that was at the core of the problem. Whittington simply states that Duncan "for his own economic benefit, intentionally delayed filing this action for three (3) years."  Def. Resp. to Pl. M.S.J. on Affirm. Defs., ¶ 37.1.  But his allegations do not describe an unreasonable delay.  There is nothing inherently unreasonable about acting to one's own "economic benefit," nor in delaying for a time to assert one's rights, particularly when significant investigation into land documents and other facts is required, or when one wants to extricate oneself from certain investments or partnerships before bringing suit.  In fact, Texas courts have held that "[a]s a general rule, laches will not bar a plaintiff's suit before the statute of limitations has run absent 'extraordinary circumstances' that would work a 'grave injustice.'"  *Fox*, 2012 WL 2979053, at *3 (quoting *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998)).  The summary judgment record does not reflect any risk of "grave injustice" as a result of Plaintiffs' delays.  The laches defense is meritless.

As far as fraud, Texas law requires the following elements to make out a fraud claim:

(1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002)).  Even if the behaviors as alleged could meet some of these elements, the sixth element, loss, is difficult to sustain in light of the settlement agreement.  The parties reached a comprehensive set of agreements based on their obligations to one another at that time, and the Court is reluctant to look past the settlement document into what remaining "loss," if any, Whittington can be said to have suffered at that time.

Furthermore, even if Whittington could make out an independent fraud claim based on

the September 2012 transaction, he does not explain how it could serve as an affirmative defense to the claims at hand, which are based on distinct activities from years before. There is simply no nexus between the alleged fraud and the dispute at hand. Whittington's fraud defense must fail.

Plaintiffs have pointed to a lack of a "fact issue in the record" concerning any of these issues. Thus the burden shifted to Whittington. He has failed to show "significant probative evidence" of a "triable issue of fact." *Century Savings & Loan*, 21 F.3d at 1107. The Court grants summary judgment to Plaintiffs on Whittington's affirmative defenses of unclean hands, fraud, and laches.

### C. Damages

In relevant part, § 523(a)(2)(A) covers "any debt . . . for money . . . to the extent obtained by . . . a false representation, or actual fraud . . . ." This section has been held to cover "all liability arising from fraud," including for instance restitution, exemplary damages, and attorneys' fees. *Cohen v. de a la Cruz*, 523 U.S. 213, 215 (1998); *see also In re Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996) (analyzing whether damages claims "arise out of the same set of transactions . . . underlying [creditor's] . . . objection to dischargeability"). The same principle applies to claims under § 523(a)(4), which covers "any debt . . . for fraud or defalcation while acting in a fiduciary capacity"; a court must ascertain the degree to which the debt in question "arises from" the fraud while in a fiduciary capacity. *See Smiedt v. Williams (In re Williams)*, Adv. No. 13-4062, 2014 WL 2624911 (applying *Cohen* "arising from" test to § 523(a)(4) context).

Here, because there is no pre-existing judgment on Plaintiffs' claims, the Court must determine the amount of Whittington's liability arising from fraud and breach of fiduciary duty

by looking to the damages that Whittington owes Plaintiffs under the relevant Texas state law. *See Morrison v. W. Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 479 (5th Cir. 2009) (finding that bankruptcy courts have jurisdiction to determine the amount of a debt arising under state law causes of action, and noting that "[l]ogically, the litigation necessary to prove nondischargeability also proves the basis for and amount of the debt").

Whittington argues that even if the Court finds him liable for fraud or a breach of fiduciary duty, damages are not due to Plaintiffs because the Investor Partnerships and limited partners did not suffer any losses. Indeed, he argues, they got a good deal, paying a fair price under the circumstances then existing, no matter whether some of the money ended up in his pocket instead of with the actual sellers of the land.

But Texas precedent teaches that having breached his fiduciary duties, committed fraud, and received secret profits as a result, Whittington may not escape Plaintiffs' claims by appealing to some hypothetical, alternate world in which his fees might have been deemed acceptable or reasonable, if they had been disclosed. Plaintiffs are entitled to recover at least what Whittington himself gained through his fraud.[19] "[U]nder Texas law, a trustee may be

---

[19] Whittington also argues that restitution or disgorgement is inappropriate because it was not properly pled. Whittington cites no law supporting his position, and the Court does not find it meritorious. While Whittington is correct that neither "restitution" nor "disgorgement" appears in the complaint, Plaintiffs state they seek "actual and compensatory damages" as well as "exemplary damages," and the sums they seek for actual and compensatory damages equate to the total of the "secret cuts." *See, e.g.*, First Am. Compl., ¶¶ 39, 58, 79. Thus, from the start Plaintiffs have sought disgorgement of the same sum that they still seek. They did so by means of the requisite "short and plain statement of the claim" for damages upon which they are proceeding. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) ("Courts must focus on the substance of the relief sought and the allegations pleaded, not on the label used.") (holding that a claim for "surcharge" had been plausibly stated even though the precise term had not been used); *Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*, No. H-11-2086, 2012 WL 3028107, at *3-4 (S.D. Tex. July 24, 2012) (applying *Twombly* standards to pleading for equitable restitution relief). For these reasons, Whittington was on

required to forfeit any gains received while engaging in self-dealing involving trust property." *Lee v. BMCY, Inc.*, No. 3-01-CV-1262-BD, 2002 WL 31045979 (N.D. Tex. Sept. 11, 2002) (citing *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200-01 (Tex. 2002), *Burrow v. Acre,* 997 S.W.2d 229, 237-39 (Tex. 1999), and *Slay v. Burnett Trust*, 187 S.W.2d 377, 389 (1945)); *see also Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 187 (Tex. App.— Houston [1st Dist.] 2005, no pet.) ("A fiduciary must account for, and yield to the beneficiary, any profit he makes as a result of his breach of fiduciary duty."); *Crenshaw*, 611 S.W.2d at 890-91 (holding that the fact that no harm was suffered as a result of the breach of duty "is immaterial," because a self-dealing fiduciary faces "strict liability"; ordering "equitable restitution" of contributions to partnership); *Restatement (Third) of Restitution and Unjust Enrichment* § 43, comment b (2011) ("[A] liability in restitution by the rule of this section does not depend on proof either that the claimant has sustained quantifiable economic injury or that the defendant has earned a net profit from the transaction.").   The language of the Texas Supreme Court in *Kinzbach*, quoted above, is relevant here:

> A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. . . . It is the law that in such instances if the fiduciary "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (quoting *United States v. Carter*, 217 U.S. 286, 305 (1910)).  Whittington cannot receive a commission for his

---

sufficient notice that Plaintiffs were seeking relief under remedies of restitution or disgorgement or both.  *See* Def. Resp. to Pl. M.S.J. on Liab., ¶¶ 42-43; Pl. Reply to Def. Resp. to Pl. M.S.J. on Liab., 5-6.  In any case, since the Court reserves a final decision on damages at this time, Whittington will have ample additional opportunity to argue against the remedies sought by Plaintiffs, so he is in no way prejudiced.

alleged efforts at development, because, as the Fifth Circuit has held, "[u]nder Texas law, a fiduciary who breaches his duties forfeits his right to compensation as a matter of law." *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 791 (5th Cir. 1993); *see also Watson v. Ltd. Partners of WCKT, Ltd.*, 570 S.W.2d 179, 182 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.) (breach of fiduciary duty "automatically results in the forfeiture of the agent's compensation" (quoting *Russell v. Truitt*, 554 S.W.2d 948, 952 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e.))). While the parties (and some courts, *see, e.g.*, *Bennett*, 989 F.2d at 790) discuss this remedy as "restitution," it can also be characterized more specifically as "disgorgement." The Fifth Circuit has explained that:

> [D]isgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does. Thus, a disgorgement order might be for an amount more or less than that required to make the victims whole.

*S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) (internal citations omitted); *see also Restatement (Third) of Restitution and Unjust Enrichment* § 51, comment a (2011) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.'"). Whatever term is used, the bottom line is that under clear Texas law, Whittington will owe a non-dischargeable debt for the gains that he, G&W, and Madras received from the Challenged Transactions. This, at a minimum, is the debt—proximately caused by his deceit, his breach of duty, and fraud—that has been here held non-dischargeable.

But Plaintiffs request more than this easily supported damages award, claiming they are entitled to the *entire* difference between what they paid for the land and what the sellers of the land received—approximately $1.7 million. In other words, they seek to put Whittington on the hook not only for the profits he made from the transactions (including through G&W and

Madras, Inc.), but also the profits taken—with his knowledge—by his associates (including through Hays Land Partners, Ltd.; C.L.A.F. Co., LLC; and John Trube).

Some cases support an extension of liability beyond the breacher of fiduciary duties, to his associates who knowingly participate in the breach. The *Kinzbach* court noted that "[i]t is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." 160 S.W.2d at 514. In *Daniel v. Falcon Investment Realty Corp.*, as a result of a fiduciary's breach of duty, the other associates (his family members) were obligated to "disgorge their profits resulting from [the fiduciary's] . . . breach of his fiduciary duty." 190 S.W.3d at 187. But in *Daniel*, the fiduciary's associates were parties to the lawsuit (though two of them settled pretrial), and in addition, the damages findings were made only after a trial and pursuant to the court's extensive and detail findings. *Id.* Also, in *Daniel*, the ultimate award took account of the costs of the project as proven at trial, and the court forced only the disgorgement of profits. *Id.* at 181, 184.

There is some evidence in the record suggestive of knowledge of the scheme on the part of Trube, Gannaway, and the rest. But at this point, the evidence does not establish their knowing participation in a breach of fiduciary duty. *See Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App.—Austin 2001, pet. denied) (no claim against supposed joint tortfeasor where no showing of knowing participation). Nor, of course, could the Court, consistent with Due Process, find these non-parties liable as "joint tortfeasors," as they have had no opportunity to defend themselves. What Plaintiffs seek is to put Whittington on the hook for all of the amounts taken secretly on top of what was paid to the sellers of each property, including the amounts taken by his associates.

Case law provides some support for extending a fiduciary's liability beyond what the fiduciary himself directly took. For instance, the bankruptcy court in *Jones* awarded restitution in the form of a non-dischargeable § 523 debt, based on partnership funds misappropriated by the debtor and his associates (who used the partnership funds as the debtor's "own personal piggy bank"), after a close review of business records and with the aid of expert testimony. *Mullen v. Jones (In re Jones)*, 445 B.R. 677, 717-18 (Bankr. N.D. Tex. 2011). As noted, § 523 exempts from discharge all liabilities arising from the misrepresentations, failures to disclose, and fraudulent acts in a fiduciary capacity. *Cohen*, 523 U.S. at 223. The case law suggests that the Court has some discretion in determining the appropriate quantum of damages. *See, e.g.*, *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000) (noting that "because damages are difficult to prove in breach of fiduciary duty cases, litigants and courts must be flexible and imaginative in calculating the proper measure of damages"); *Jones*, 445 B.R. at 716 (citing *Bennett*, 989 F.2d at 790-91, and noting that various remedies are available for breach of fiduciary duty to limited partners); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2001) (noting that "courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty" and outlining considerations to be taken into account).

While the Court may eventually award further damages, the record is inadequate to support a further award at this time. The Court will consider additional testimony and evidence concerning whether Whittington should be held accountable for the amounts that went to the third parties, as misappropriated partnership funds. Even the funds that did not go to Whittington personally may have benefitted his commercial associates at the expense of the partners and partnerships to whom he owed duties, including the duties to advise them of all

material information concerning the transactions.

At a hearing on this issue, the Court's considerations will include each transaction as a whole, each player's role in it, and the value (if any) provided by the recipients of payments. If it becomes apparent that the funds that went to Whittington's associates did not work to the advantage of the partnership, redounded to Whittington's personal gain directly or indirectly, or were not directly related to the value added to each Investor Partnership's interest in each respective transaction, Whittington may be obliged as a breaching fiduciary to repay those funds that he secretly misdirected or allowed to be secretly misdirected as a result of his breach.

Plaintiffs have also requested an award of attorneys' fees, interest, and exemplary damages. Under Texas case law, "exemplary damages would be proper where 'a fiduciary has engaged in self-dealing,'" and where the plaintiff can prove by clear and convincing evidence that the debt arose by actual fraud, malice, or gross negligence. *Jones*, 445 B.R. at 719 (Bankr. N.D. Tex. 2011) (quoting *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex. App.—Houston 1990, no pet.) (citing TEX. CIV. PRAC. & REM. CODE §§ 41.001, 41.003)); *see also Lesikar v. Rappeport*, 33 S.W.3d 282, 311 (Tex. App.—Texarkana 2000, pet. denied) (upholding punitive damages award where fiduciary engaged in self-dealing, because in such a situation fraudulent intent is presumed); *Natho v. Shelton*, No. 03-11-00661-CV, 2014 WL 2522051, at *2 (Tex. App.—Austin May 30, 2014, no. pet. h.) ("When a fiduciary intentionally breaches his duty by self-dealing and thereby gaining a benefit for himself, willful and fraudulent acts are presumed."); *Drexel Highlander Ltd. P'ship v. Edelman (In re Edelman)*, No. 13-3078, 2014 WL 1796217, at *29-31 (Bankr. N.D. Tex. May 6, 2014) (applying the presumption of intent in *Lesikar*, 33 S.W.3d at 311, to support an exemplary damages award). As noted, bankruptcy law permits these additional awards to be deemed part of a nondischargeable debt so long as they

arise from the acts that led to this Court's nondischargeability finding.  *Cohen*, 523 U.S. at 223.

Plaintiffs may well be entitled to these additional grounds for relief, but making all the findings necessary to support awards of exemplary damages, attorneys' fees, and interest will require more evidence than is in the record at this point.  The Court will set a hearing to consider all these remaining matters so that this adversary proceeding may be brought to an end.

## V.  <u>CONCLUSION</u>

For the reasons stated above, the Court will grant summary judgment to Plaintiffs on all matters but their request for damages, which is granted only in part, as to the amounts taken by Whittington and the entities in which had a direct stake.  Whittington's motion will be denied in its entirety.

The amount of Whittington's non-dischargeable debt, which may include awards of restitution/disgorgement, interest, attorneys' fees, and punitive damages, will be determined a future hearing.

An order will issue to this effect.